## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MATTHEW MCNEELY, CLAUDINE
SHERIDAN, ANGELA BOONIE,
SHARON BRENNEMAN, BRIAN
HICKMAN, KENNETH LAKE JR., LISA
BOSTELMAN, DOUGLAS BAUMAN,
JASON SHORT, TRAVIS SILVER, and
JOHN ROTHAR, individually and on
behalf of all others similarly situated,

        Plaintiffs,

   v.

FCA US, LLC, d/b/a STELLANTIS
NORTH AMERICA,

        Defendant.

Case No.:

CLASS ACTION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs Matthew McNeely, Claudine Sheridan, Angela Boonie, Sharon Brenneman, Brian Hickman, Kenneth Lake Jr., Lisa Bostelman, Douglas Bauman, Jason Short, Travis Silver, and John Rothar (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege as follows upon personal knowledge as to themselves, and as to all other matters upon information and belief, and based upon the investigation undertaken by their counsel.

## INTRODUCTION

1.     This is a class action lawsuit brought against Defendant FCA US, LLC, d/b/a Stellantis North America ("FCA" or "Defendant"), by Plaintiffs individually and on behalf of a class of current and former owners and lessees of the following vehicle models ("Class Vehicles" or "Vehicles")[1] equipped with the Uconnect infotainment system ("Uconnect" or "Uconnect 5"):

- 2021-2024 Chrysler Pacifica
- 2022-2024 Ram pickup trucks (1500, 2500, 3500)
- 2022-2024 Ram Chassis Cab
- 2022-2024 Ram ProMaster
- 2022-2024 Jeep Wagoneer and Grand Wagoneer
- 2022-2024 Jeep Compass
- 2022-2024 Jeep Grand Cherokee and Jeep Grand Cherokee L
- 2022-2024 Dodge Durango
- 2023-2024 Dodge Hornet

2.     Uconnect is a multimedia and video interface—often referred to as an in-car entertainment or in-vehicle infotainment system—in the Class Vehicles' center console. Among other things, Uconnect operates the visual for the backup camera, the controls for the audio and radio system, cell phone connectivity, weather information, and the navigation system. An infotainment system is designed to be the gateway between the driver and the vehicle's safety, navigation, communication, and entertainment features.

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years after conducting discovery.

3.      FCA's website dedicated to the Uconnect system touts its features in four areas: entertainment, phone calls, voice commands, and navigation. FCA's advertisements in each of these areas are reproduced below:

ENTERTAINMENT
Keep your family entertained with the available Uconnect® system and SiriusXM®, offering a wide variety of ad-free channels.



PHONE

Conveniently make and receive calls, reply to text messages, play songs and more right from your vehicle.



VOICE COMMAND

Leave your hands on the wheel and your eyes on the road thanks to voice command features that let you take control of your entertainment, available navigation, climate and more.



NAVIGATION
Available navigation offers information about your route along the way, inviting you to explore with confidence in your vehicle.



4.      Rather than reliably providing these features, the Class Vehicles' infotainment systems are plagued by a series of issues stemming from a common defect that causes many features—including the navigation, audio system, and Bluetooth connectivity—to malfunction, operate intermittently, and even become inoperable. The defect can also render critical safety-related systems to fail, namely the backup camera and its display. When the system abruptly malfunctions while the car is being driven, unexpected audio or video errors can cause the driver to become distracted. Collectively, this is referred to herein as the "Defect." As discussed in more detail below, the Defect poses a significant safety hazard to drivers and occupants of Class Vehicles, and other members of the public.

5.     FCA has long known of the Defect from multiple sources. It was aware of the Defect from, *inter alia,* internal warranty and repair records submitted directly to the company and to its authorized dealers, rigorous pre-release testing, and complaints on consumer message boards and as collected by the National Highway Transportation Safety Administration ("NHTSA").

6.     Despite having pre-sale, superior knowledge of the Defect and the safety issues associated with it, FCA has failed to issue a service campaign or technical service bulletin (TSB) that rectifies the Defect, or a recall of the Vehicles, and has not made Class Vehicle owners and lessees whole. Instead, FCA failed to disclose, and actively concealed, the Defect from the public, and continues to manufacture, advertise, distribute, and sell and re-sell the Vehicles without disclosing this material information.

7.     As a result of FCA's misconduct, Plaintiffs and Class Members were each economically injured on account of receiving Class Vehicles that are fundamentally different from what they believed they were purchasing, and which are less valuable than was represented at the time of sale.

8.     In manufacturing, marketing, and selling and/or leasing the Class Vehicles with the undisclosed Defect, FCA has engaged in unfair, deceptive, and misleading consumer practices, and has breached its warranty with Class Vehicle purchasers and lessees, including Plaintiffs.

9.     Plaintiffs bring this action individually and on behalf of the Class defined below for negligent misrepresentation, common law fraud, breach of express and implied warranties, violations of the Magnusson-Moss Warranty Act fraud, violations of various state consumer protection laws and, alternatively, unjust enrichment. In addition to monetary damages, they seek declaratory and injunctive relief to prevent FCA's continued misconduct.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) there are 100 or more Class Members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) this is a class action in which numerous Class Members, including each of the Plaintiffs, and the Defendant, are citizens of different states.

11.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, transacts business within this District, and committed one or more tortious acts within this District.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that the events that substantially give rise to the claims in this case occurred in this District.

## PARTIES

### Plaintiffs

### *Plaintiff Sharon Brenneman (Florida)*

13.    Plaintiffs Sharon Brenneman is a citizen of the State of Florida.

14.    On April 25, 2023, Ms. Brenneman purchased a new 2022 Chrysler Pacifica Hybrid, equipped with Uconnect 5, from Douglas Jeep, Inc., an authorized FCA dealership, in Venice, Florida.

15.    The Defect has impacted Ms. Brenneman since she purchased her Chrysler Pacifica. The GPS will frequently drop when it is being used for navigation purposes. The GPS system has difficulty finding the current location when Ms. Brenneman is using the GPS for directions, leading to distracted driving when trying to reorient the GPS. Also, the GPS occasionally will turn off and on.

16.    The GPS system is very unreliable. Often when the GPS goes off, Ms. Brenneman needs to use her cellphone for directions while driving.

17.    The app that Ms. Brenneman uses is supposed to sync her Android smartphone with the Uconnect 5 through Bluetooth. However, that feature does not work consistently.

18.    As a result of these issues, Ms. Brenneman is forced to take her eyes off the road to address the problems, causing driver distraction.

19.    FCA's omissions about the Defect as described herein were material to Ms. Brenneman. Had FCA disclosed its knowledge of the Defect before Ms. Brenneman purchased her Class Vehicle, she would have seen that disclosure and been aware of the Defect. This information is material because had this information been disclosed, Ms. Brenneman would have not purchased, or would have paid less for, her Class Vehicle.

20.    To attempt to resolve the Defect, on November 21, 2023, Ms. Brenneman visited Gettel Chrysler Dodge Jeep Ram, an authorized FCA dealership in Punta Gorda, Florida. There, a dealership technician noted in the invoice that Ms. Brenneman complained of the GPS malfunctioning and not syncing to her Android device.

21.    The technician performed a radio reset and told Ms. Brenneman to return to the dealership if the issues persist.

22.    She returned with similar complaints of the GPS not working on or about December 4, 2023 and December 29, 2023. At the time of the visits the Vehicle had been driven approximately 3,086 miles and 3,269 miles, respectively.

23.    On May 3, 2024, Ms. Brenneman returned to Gettle Chrysler Dodge Jeep Ram with complaints of the GPS repeatedly not working. At the time of the visit, the vehicle had ben driven approximately 4,585 miles. The technician performed an

update on the Uconnect 5 and replaced the radio. The technician stated that as a result of the repair attempt, the Uconnect 5 was working properly.

24.     The attempted fix was short-lived, as the GPS continues to work inconsistently and Ms. Brenneman continues to experience problems. If anything, the new radio does not work as well as the previous one, with the Defect now occurring more frequently. Ms. Brenneman's home screen now needs to be reset every time she uses her Vehicle.

25.     To date, Ms. Brenneman has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

26.     As result of the Defect, Ms. Brenneman has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of her Vehicle. Her Vehicle has also suffered diminution in value due to the Defect.

27.     As a result of the Defect, Ms. Brenneman has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Ms. Brenneman will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although she would like to do so.

***Plaintiff Brian Hickman (Florida)***

28.     Plaintiff Brian Hickman is a citizen of the State of Florida.

29.     He purchased a new 2023 Jeep Grand Cherokee L on May 27, 2023, from Jacksonville Chrysler Jeep Dodge Ram Arlington, an authorized FCA dealership located in Jacksonville, Florida. At the time of purchase, his vehicle had been driven approximately 76 miles.

30.     At all times, Plaintiff Hickman has used his Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

31.     Driver and passenger safety and reliability were important factors in Plaintiff Hickman's decision to purchase his Vehicle. Before making his purchase, Plaintiff Hickman reviewed the Vehicle's Monroney sticker, spoke with his dealer about the Vehicle, and test drove the Vehicle. Plaintiff Hickman selected and ultimately purchased his Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

32.     None of the information provided to Plaintiff Hickman disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA

failed to disclose the Defect to Plaintiff Hickman. FCA's misrepresentations and omissions were material to Plaintiff Hickman. Had FCA disclosed the Defect before Plaintiff Hickman purchased his Vehicle, he would have seen such disclosures and been aware of them.

33.     Plaintiff Hickman relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

34.     Plaintiff Hickman began experiencing the Defect in his Vehicle by June 2023, after having driven the vehicle for fewer than 500 miles. Specifically, the Defect first manifested with lines going across the display screen, and the screen then going black.

35.     As a result of the Defect in Plaintiff Hickman's Vehicle, he has also experienced a frozen display screen, disconnected calls, the display screen failing to show the image from the backup camera, and GPS navigation failures.

36.     As a result of these issues, Plaintiff is forced to take his eyes off the road to address the problems.

37.     On more than one occasion, and as early as December 21, 2023, with only 5,792 miles on his Vehicle, Plaintiff Hickman brought his Vehicle to an authorized FCA dealer and requested repair for the malfunctioning Uconnect system.

The dealership indicated that it could not replicate Plaintiff Hickman's concerns and informed him that the Vehicle was operating as designed.

38.     On May 9, 2024, with only 8,878 miles on the odometer, Mr. Hickman returned to the dealership and complained about the performance of his Uconnect system. The dealer initially determined that his Uconnect system was operating properly, but subsequently opened a STAR Case (No. 102506918) for Plaintiff's Hickman's Vehicle.

39.     On May 21, 2024, the dealership replaced the radio in Plaintiff Hickman's Vehicle and informed him that it was operating as designed.

40.     Despite the attempted fix, Plaintiff Hickman continues to experience the same Uconnect malfunctions with the new radio as he did with original radio in his Vehicle.

41.     To date, Plaintiff Hickman has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

42.     As result of the Defect, Plaintiff Hickman has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

43.     As a result of the Defect, Plaintiff Hickman has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and

provides a permanent repair or modification, Plaintiff Hickman will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

### Plaintiff Kenneth Lake Jr. (Florida)

44.    Plaintiff Kenneth Lake Jr. is a citizen of the State of Florida.

45.    On September 23, 2022, Plaintiff Lake Jr. purchased a new 2022 Dodge Durango SRT from Napleton Clermont Chrysler Jeep Dodge, an authorized FCA dealership located in Clermont, Florida. At the time of purchase, his Vehicle had been driven approximately 14 miles.

46.    At all times, Plaintiff Lake Jr. has used his Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

47.    Driver and passenger safety and reliability were important factors in Plaintiff Lake Jr.'s decision to purchase his Vehicle. Before making his purchase, Plaintiff Lake Jr. reviewed the Vehicle's Monroney sticker, spoke with his dealer about the Vehicle, and test drove a similar vehicle of the same model and model year. Plaintiff Lake Jr. selected and ultimately purchased his Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of

providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

48.     None of the information provided to Plaintiff Lake Jr. disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as its backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Lake. FCA's misrepresentations and omissions were material to Plaintiff Lake. Had FCA disclosed the Defect before Plaintiff Lake purchased his Vehicle, he would have seen such disclosures and been aware of them.

49.     Plaintiff Lake Jr. relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

50.     Plaintiff Lake Jr. began experiencing the Defect in his Vehicle within a month after purchase. Plaintiff Lake Jr. has had constant Uconnect failures, such as issues connecting (and staying connected) to Bluetooth, using the navigation, blank screens, distorted pictures from the backup camera, and failure of the display screen to consistently show images from the backup camera when driving in reverse.

51.     As a result of these issues, Plaintiff Lake Jr. is forced to take his eyes off the road to address the problems. In addition, Mr. Lake has had to restart his Vehicle often to correct these problems, but that approach has not always been effective.

52.     Plaintiff Lake Jr.'s late wife reported to the dealer that the Uconnect system in his Vehicle would malfunction. In response, the dealer told her that it could not replicate her concerns and that there was nothing wrong with the Vehicle.

53.     To date, Plaintiff Lake Jr. has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect in his Vehicle.

54.     As result of the Defect, Plaintiff Lake Jr. has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

55.     As a result of the Defect, Plaintiff Lake Jr. has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Lake Jr. will be unable to rely on future advertising or labeling of the Class Vehicle, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

***Plaintiff Matthew McNeely (Massachusetts)***

56.     Plaintiff Matthew McNeely is a citizen of the Commonwealth of Massachusetts.

16

57.     In May of 2021, Plaintiff McNeely purchased a 2022 Ram 1500 LTD from Brigham-Gill Village CDJR, an authorized FCA dealership located in Natick, Massachusetts. On November 29, 2021, Plaintiff McNeely's Vehicle was delivered to him. At the time of purchase and delivery, his vehicle had approximately 10 miles on it.

58.     At all times, Plaintiff McNeely has used his Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

59.     Driver and passenger safety and reliability were important factors in Plaintiff McNeely's decision to purchase his Vehicle. Before making his purchase, Plaintiff McNeely reviewed the Vehicle's Monroney sticker, spoke with his dealer about the Vehicle and test drove a similar Vehicle. Plaintiff selected and ultimately purchased his Class Vehicle because it was represented to be, and marketed as, a high-quality vehicle capable of providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

60.     None of the information provided to Plaintiff McNeely disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff McNeely. FCA's misrepresentations and

omissions were material to Plaintiff McNeely. Had FCA disclosed the Defect before Plaintiff McNeely purchased his Vehicle, he would have seen such disclosures and been aware of them.

61.    Plaintiff McNeely relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

62.    Plaintiff McNeely began experiencing the Defect in his Vehicle on or about December 2021, when the Vehicle had approximately 200 miles on it. The Defect first manifested when Plaintiff McNeely observed the Uconnect system shut down inexplicably and a software update appeared to occur mid-vehicle operation. When this Defect occurs, numerous warning symbols appear on his screen, safety features become disabled, and the system asks Plaintiff to pull over. The software updates cannot be stopped or postponed so Plaintiff must pull over;  these updates can take up to 15 minutes to complete.

63.    As a result of the Defect in Plaintiff's Vehicle, he has also experienced the following issues: the GPS crashing due to incoming text messages, which required Plaintiff to pull off to the side of the road and restart his Vehicle; the radio dropping and/or making buzzing noises; the GPS flashing or changing without reason or warning, and other GPS-related issues; and failures associated with the sensor cameras and safety system.

64.    As a result of these issues, Plaintiff is forced to take his eyes off the road to address the problems.

65.    Plaintiff called his dealership in January 2022 to ask about the issues, and was informed it was just a glitch. At the time, the Vehicle had approximately 200 miles on it. He called back several times and was assured there was an over-the-air software update that would fix the issues. Plaintiff McNeely has brought these issues up with the dealership, but the dealership indicated that there are no issues with the Vehicle. To date, Plaintiff McNeely has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

66.    As a result of the Defect, Plaintiff McNeely has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

67.    Plaintiff McNeely also suffered actual damages as a result of the Defect. Plaintiff purchased real-time traffic updates through the Uconnect system that, when working properly, displays traffic flow, traffic light updates, and other features. Plaintiff McNeely continues to pay an annual fee of $159 to use this service. As a result of the Defect, however, the traffic update service is disrupted by incoming texts, switching between screens on the Uconnect infotainment system, the screen

shutting off. Even when the Plaintiff restarts the vehicle, the system may function in the first instance but ceases to work when disrupted.

68.     As a result of the Defect, Plaintiff McNeely has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff McNeely will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

### Plaintiff Claudine Sheridan (New Jersey)

69.     Plaintiff Claudine Sheridan is a citizen of the State of New Jersey.

70.     On or about March 25, 2023, Plaintiff Sheridan leased a new 2023 Dodge Durango from Lester Glenn Auto Group, an authorized FCA dealership located in Toms River, New Jersey. At the time of her lease, the vehicle had approximately 13 miles on it.

71.     At all times, Plaintiff Sheridan has used her Class Vehicle in the normal and expected manner in which it was intended to be used and has driven her Class Vehicle in a foreseeable manner.

72.     Driver and passenger safety and reliability were important factors in Plaintiff Sheridan's decision to purchase her Vehicle. Before making her purchase,

Plaintiff Sheridan reviewed the Vehicle's Monroney sticker and spoke with her dealer about the Vehicle. Plaintiff selected and ultimately leased her Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The lease was based, in part, on the advertised safety, reliability, and quality of the vehicle and its components.

73.     None of the information provided to Plaintiff Sheridan disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Sheridan. FCA's misrepresentations and omissions were material to Plaintiff Sheridan. Had FCA disclosed the Defect before Plaintiff Sheridan purchased her Vehicle, she would have seen such disclosures and been aware of them.

74.     Plaintiff Sheridan relied on FCA's misrepresentations and omissions in purchasing the Vehicle and, absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

75.     Plaintiff Sheridan began experiencing the Defect in her Vehicle in approximately June 2023, within a couple of months after purchasing the Vehicle. The Defect manifested when Plaintiff Sheridan first observed the Uconnect system intermittently and inexplicably freezing and rebooting. When this happens, the screen and safety features accessed through the screen are disabled.

76.     As a result of the Defect in Plaintiff's Vehicle, she has also experienced the following issues: sporadic failure of navigation system, such as the GPS flashing or changing without reason or warning, and other GPS-related issues; failures associated with the sensor cameras and safety system; and issues with the display screen going blank and non-responsive touchscreen buttons.

77.     As a result of these issues, Plaintiff is forced to take her eyes off the road to address the malfunctions.

78.     Plaintiff brought these issues up with the dealership on or about March 15, 2024, however, the dealership indicated that it could not provide a repair or remedy for these issues because they could not replicate the problems at the time of her appointment. At the time she brought the it in for service, Plaintiff Sheridan's Vehicle had approximately 9,678 miles on it. To date, Plaintiff Sheridan has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

79.     Plaintiff Sheridan's Vehicle has suffered diminution in value due to the Defect.

80.     As a result of the Defect, Plaintiff Sheridan has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Sheridan will be unable to rely

on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although she would like to do so.

**Plaintiff Travis Silver (Oregon)**

81.     Plaintiff Travis Silver is a citizen of the State of Oregon.

82.     On September 16, 2022, Mr. Silver purchased a new 2022 Jeep Compass, equipped with Uconnect 5, from Newberg Dodge Chrysler Jeep, an authorized FCA dealership, in Newberg, Oregon.

83.     FCA's omissions were material to Mr. Silver. Had FCA disclosed its knowledge of the Defect before Mr. Silver purchased his Class Vehicle, Mr. Silver would have seen and been aware of the Defect. Mr. Silver would have not purchased, or would have paid less for his Class Vehicle had he known of the Defect.

84.     Since purchase, the Defect has caused significant issues in his Jeep Compass, including constant "glitching" and the Uconnect 5 system sending false error codes.

85.     The Uconnect 5 screen in Mr. Silver's vehicle will often not work, which causes him extreme frustration.

86.     As a result of these issues, Mr. Silver is forced to take his eyes off the road to address the problems.

87.     Mr. Silver went to Newberg Dodge multiple times because of the Defect. The technician at the dealership claimed to fix the Defect with a software update, but it remained.

88.     After another visit, a technician at the dealership said that he could not find any issues associated with the Defect and returned the vehicle to Mr. Silver.

89.     The technician informed Mr. Silver that he would have to take videos of the problem happening in real time or the dealership would not replace the radio.

90.     As soon as Mr. Silver left the dealership, the whole Uconnect 5 screen went black. Mr. Silver took videos and sent them to the dealership.

91.     A technician performed a part replacement, which he advised would fix the problem. That turned out to be untrue.

92.     In February of 2023, Mr. Silver needed to reach out to the corporate department at Jeep in order for the dealership to order a new radio to install in his Vehicle.

93.     The representative was looking into ordering a new radio for his Class Vehicle and noted a lot of customer concerns about  glitching radios across models, and the extensive software updates involved.

94.     Ultimately, Mr. Silver was able to get a new radio through the Consumer Affairs Department at Newberg Dodge, but the new radio continued to malfunction

in the same manner as the original radio. Thus, replacing the radio did not fix the Defect.

95.     This is one of many visits and interactions that Mr. Silver has had with Newberg Dodge. Mr. Silver has brought his vehicle to Newberg Dodge at least four times to resolve the Defect, but it still remains unrepaired.

96.     To date, Mr. Silver has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

97.     As result of the Defect, Mr. Silver has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

98.     As a result of the Defect, Mr. Silver has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Mr. Silver will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

**Plaintiff Angela Boonie (Pennsylvania)**

99.     Plaintiff Angela Boonie is a citizen of the Commonwealth of Pennsylvania.

100.     In or about January of 2022, Plaintiff Boonie began leasing a 2022 Jeep Compass from Price Motor Sales, an authorized FCA dealership located in Cassville, Pennsylvania (the dealership was subsequently purchased by Stuckey Chrysler Dodge Jeep Ram, and moved to Huntingdon, Pennsylvania). At the time of her lease, the mileage on the Vehicle's odometer was approximately 1 mile.

101.     At all times, Plaintiff Boonie has used her Class Vehicle in the normal and expected manner in which it was intended to be used and has driven her Class Vehicle in a foreseeable manner.

102.     Driver and passenger safety and reliability were important factors in Plaintiff Boonie's decision to lease her Vehicle. Before entering into her lease, Plaintiff Boonie spoke with her dealer about the Vehicle. Plaintiff selected and ultimately leased her Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe and reliable transportation. The lease was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

103.     None of the information provided to Plaintiff Boonie disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of the lease, FCA failed to disclose the Defect to Plaintiff Boonie. FCA's misrepresentations and omissions were material to Plaintiff Boonie. Had FCA disclosed the Defect before

Plaintiff Boonie leased her Vehicle, she would have seen such disclosures and been aware of them.

104.    Plaintiff Boonie relied on FCA's misrepresentations and omissions in leasing the Vehicle, and absent those representations and omissions, would not have leased the Vehicle or would have paid less for it.

105.    Plaintiff Boonie began experiencing the Defect in her Vehicle approximately one month after leasing it. The Defect manifested when Plaintiff Boonie first observed the Uconnect system freeze at the start up of the vehicle, while the Jeep logo was still on display, resulting in the Uconnect system remaining stuck on this screen. This has caused the screen, and all vehicle features accessible through the infotainment system screen, to become inoperable and inaccessible.

106.    As a result of the Defect in Plaintiff's Vehicle, she has experienced the following issues: inability to use the GPS navigation system; inability to use Bluetooth connectivity features; inability to use the radio, for which Plaintiff has paid a premium service; inability to use or rely on safety features, such as hands-free features and the backup camera; and inability to use vehicle cabin features, such as temperature control.

107.    As a result of the Defect, Plaintiff's use of safety, entertainment, or even the hands-free vehicle features that she paid for, have been restricted.

108.    Plaintiff brought these issues up with the dealership on March 1, 2024.

At that time, her Vehicle had approximately 11,155 miles on it. The dealership initially indicated that upon examination of the Vehicle's defect, it ordered a replacement for the Uconnect infotainment system that would alleviate Plaintiff Boonie's issues. Plaintiff Boonie contacted the dealership again on April 9, 2024, but the dealership reported that the replacement part it previously indicated it had ordered was now on backorder indefinitely, without a time frame for when the replacement part would become available, leaving Plaintiff without a remedy.

109.    On April 26, 2024, the dealer replaced the infotainment system in Plaintiff's Vehicle. Even with the replacement Uconnect system, Plaintiff Boonie's system still experiences freezing of the screen, requiring her to restart the system.

110.    As result of the Defect, Plaintiff Boonie has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of her Vehicle. Her Vehicle has also suffered diminution in value due to the Defect.

111.    As a result of the Defect, Plaintiff Boonie has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Boonie will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles.

*Plaintiff Lisa Bostelman (Pennsylvania)*

112.   Lisa Bostelman is a citizen of the Commonwealth of Pennsylvania.

113.   Plaintiff Bostelman purchased a new 2022 Chrysler Pacifica on February 8, 2022 from Brown-Daub Chrysler Jeep Dodge RAM, an authorized FCA dealership in Easton, Pennsylvania. At the time of purchase, her vehicle had approximately 15 miles on it.

114.   At all times, Plaintiff Bostelman has used her Class Vehicle in the normal and expected manner in which it was intended to be used.

115.   Driver and passenger safety and reliability were important factors in Plaintiff Bostelman's decision to purchase her Vehicle. Before making her purchase, Plaintiff Bostelman reviewed the Vehicle's Monroney Sticker and spoke with her dealer about the Vehicle. Plaintiff selected and ultimately purchased her Class Vehicle because the Vehicle was represented to be a high-quality vehicle capable of providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the vehicle and its components.

116.   None of the information provided to Plaintiff Bostelman disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Bostelman. FCA's misrepresentations and omissions were material to Plaintiff Bostelman. Had FCA disclosed the Defect before

Plaintiff Bostelman purchased her Vehicle, she would have seen such disclosures and been aware of them.

117.   Plaintiff Bostelman relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

118.   About a month after purchasing the Vehicle, Plaintiff Bostelman's Uconnect 5 system began to exhibit recurrent black and freezing dashboard screens, as well as the Bluetooth disconnecting.

119.   As a result of these issues, Plaintiff Bostelman is forced to take her eyes off of the road to address the problems. Specifically, she has needed to reset the Uconnect while driving, which she reports is very distracting.

120.   As early as April of 2022, with under 5,000 miles on her vehicle, Plaintiff Bostelman informed her dealer that the Uconnect in her Vehicle was malfunctioning. The dealer verified her concern but offered no repairs.

121.   Thereafter, Plaintiff Bostelman repeatedly complained to her dealer about her malfunctioning Uconnect system. The dealer eventually performed an ineffective software update in August of 2022.

122.   Because the Defect in her Vehicle remained, the dealer attempted to correct to the defect by replacing the radio in her Vehicle in February of 2023. However, Plaintiff Bostelman has continued to observe the same issues with her

Uconnect system that plagued the Vehicle's original radio. In February of 2024, Plaintiff Bostelman again asked for repair of her Uconnect system.

123.   To date, Plaintiff Bostelman has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

124.   As result of the Defect, Plaintiff Bostelman has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of her Vehicle. Her Vehicle has also suffered diminution in value due to the Defect.

125.   As a result of the Defect, Plaintiff Bostelman has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Bostelman will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although she would like to do so.

***Plaintiff Douglas Bauman (Tennessee)***

126.   Douglas Bauman is a citizen of the State of Tennessee. Mr. Bauman bought his 2022 Jeep Grand Cherokee new on September 30, 2022, from Lenoir City Chrysler Dodge Jeep Ram, an authorized FCA dealership in Lenoir City, Tennessee. At the time of purchase, his vehicle had approximately 1,105 miles on it.

127.   At all times, Plaintiff Bauman has used his Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

128.   Driver and passenger safety and reliability were important factors in Plaintiff Bauman's decision to purchase his Vehicle. Before making his purchase, Plaintiff Bauman reviewed the Vehicle's Monroney Sticker and spoke with his dealer about the Vehicle. Plaintiff selected and ultimately purchased his Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

129.   None of the information provided to Plaintiff Bauman disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Bauman. FCA's misrepresentations and omissions were material to Plaintiff Bauman. Had FCA disclosed the Defect before Plaintiff Bauman purchased his Vehicle, he would have seen such disclosures and been aware of them.

130.   Plaintiff Bauman relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

131.  Shortly after purchasing his vehicle, Plaintiff Bauman began experiencing problems with the Vehicle's Uconnect 5 system, including: connectivity issues related to paired devices; the dashboard screen freezing and blacking out; compass failures; and the touchscreen not recognizing Waze or Pandora.

132.  Plaintiff Bauman has repeatedly complained about these problems to his FCA dealership, including on January 2, 2023, when his vehicle had only been driven 6,396 miles. The dealer has, at times, confirmed Plaintiff Bauman's complaints. However, in response, the dealer informed him that a software upgrade would be available in the future, performed software upgrades that did not correct the Defect or informed Plaintiff Bauman that there is nothing they can do to fix his Uconnect system.

133.  In addition, representatives of the dealer have told Plaintiff Bauman that they are aware of the problems with the Uconnect system and hear about them from customers every day.

134.  Mr. Bauman has also contacted FCA's customer service center directly in an effort to have his Uconnect system repaired. He has been told, on more than one occasion, to wait for a software upgrade that will fix the problems. Still, no update has eliminated the Defect.

135.   To date, Plaintiff Bauman has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

136.   As result of the Defect, Plaintiff Bauman has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

137.   As a result of the Defect, Plaintiff Bauman has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Bauman will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

### Plaintiff Jason Short (Texas)

138.   Plaintiff Jason Short is a citizen of the State of Texas. On March 19, 2022, Mr. Short purchased a new 2022 Ram 3500, equipped with Uconnect 5, from Freedom Chrysler, an authorized FCA dealership in Sherman, Texas. At the time of purchase, his vehicle had approximately 10 miles on it.

139.   At all times, Plaintiff Short has used his Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

34

140.   Driver and passenger safety and reliability were important factors in Plaintiff Short's decision to purchase his Vehicle. Before making his purchase, Plaintiff Short reviewed the Vehicle's Monroney sticker, spoke with his dealer about the Vehicle, and test drove the Vehicle. Plaintiff selected and ultimately purchased his Class Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the Vehicle and its components.

141.   None of the information provided to Plaintiff Short disclosed the Defect in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Short. FCA's misrepresentations and omissions were material to Plaintiff Short. Had FCA disclosed its knowledge of the Defect before Plaintiff Short purchased his Class Vehicle, he would have seen and been aware of it.

142.   Plaintiff Short relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, he would have not purchased, or would have paid less for, his Class Vehicle.

143.   Plaintiff Short's Uconnect 5 system will often display error messages indicating that the Uconnect requires servicing and to "visit an authorized dealer."

144. The GPS feature in the Uconnect 5 will also malfunction, causing distracted driving.

145. At times, the Uconnect 5 screen will shut off and go black. Plaintiff Short is unable to turn the screen back on, and at times must perform a hard reset while driving to get the Uconnect 5 to operate, which is a safety concern. As a result of these issues, Plaintiff is forced to take his eyes off of the road to address the problems.

146. On May 31, 2023, Plaintiff Short had the radio replaced in his Class Vehicle. Although the radio has been replaced, the Defect still remains. At the time the radio was replaced, the Vehicle had 25,830 miles on it.

147. To date, Plaintiff Short has received no notification from FCA about any potential permanent repair or modification that would eliminate the Defect.

148. As result of the Defect, Plaintiff Short has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

149. As a result of the Defect, Plaintiff Short has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Short will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase

another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

***Plaintiff John Rothar (New York)***

150.   Plaintiff John Rothar is a resident of the State of New York.

151.   On or about August 1, 2022, Plaintiff Rothar purchased a 2022 Jeep Wagoneer from Huntington Jeep Chrysler Dodge Ram, an authorized FCA dealership located in Huntington, New York. At the time of purchase and delivery, his vehicle had approximately 70 miles on it.

152.   At all times, Plaintiff Rothar has used his Vehicle in the normal and expected manner in which it was intended to be used and has driven his Vehicle in a foreseeable manner.

153.   Driver and passenger safety and reliability were important factors in Plaintiff Rothar's decision to purchase his Vehicle. Before making his purchase, Plaintiff Rothar reviewed the Vehicle's Monroney sticker, spoke with his dealer about the Vehicle, and test drove a similar Vehicle. Plaintiff selected and ultimately purchased his Vehicle because the Vehicle was represented to be, and marketed as, a high-quality vehicle capable of providing safe and reliable transportation. The purchase was based, in part, on the advertised safety, reliability, and quality of the vehicle and its components.

154.   None of the information provided to Plaintiff Rothar disclosed the Defect

in the Uconnect system, which, as noted, affects certain of the Vehicle's advertised safety systems, such as the backup camera. At the time of purchase, FCA failed to disclose the Defect to Plaintiff Rothar. FCA's misrepresentations and omissions were material to Plaintiff Rothar. Had FCA disclosed the Defect before Plaintiff Rothar purchased his Vehicle, he would have seen such disclosures and been aware of them.

155.    Plaintiff Rothar relied on FCA's misrepresentations and omissions in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

156.    Plaintiff Rothar began experiencing the Defect in his Vehicle in or about September 2023. Plaintiff Rothar observed the Uconnect system would shut down inexplicably about every eight minutes, and would restart on its own, losing all previously inputted information.

157.    As a result of these issues, Plaintiff is forced to take his eyes off of the road to address the problems.

158.    Plaintiff took the Vehicle into an FCA dealership to address this issue in or around October 2023. At the time, his Vehicle had approximately 28,436 miles on it. After the initial visit, the dealership stated they had fixed the software problem. However, about eight minutes after leaving the dealership, the Uconnect system again shut down and restarted on its own. Plaintiff followed up with the dealership multiple times for this ongoing problem, and was told each time that they were expecting an

"over-the-air" software update soon that would fix the issue. However, the issue has not been fixed by any subsequent updates. Plaintiff has attempted to take the Vehicle into the dealership on at least two additional occasions, however, upon arrival to the dealership for his prescheduled appointments, the dealership was not able to accommodate him due to a lack of promised loaner vehicles.

159.    As result of the Defect, Plaintiff Rothar has incurred loss of personal time spent dealing with, and trying to resolve, the Defect and loss of use of his Vehicle. His Vehicle has also suffered diminution in value due to the Defect.

160.    In addition to the foregoing injuries, Plaintiff Rothar suffered additional damages as a result of the Uconnect Defect. Plaintiff purchased an optional Assistance + Navigation service at an annual cost of $274.78, plus taxes. Due to the ongoing issues with the Uconnect system, Plaintiff has not been able to utilize these features.

161.    As a result of the Defect, Plaintiff Rothar has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless FCA fully discloses the Defect and provides a permanent repair or modification, Plaintiff Rothar will be unable to rely on future advertising or labeling of the Class Vehicles, and for this reason will not purchase another Class Vehicle, or any of FCA's other vehicles, although he would like to do so.

**Defendant**

162.   Defendant FCA US, LLC is a corporation organized and existing under the laws of Delaware and is authorized to conduct business in the State of Michigan. FCA maintains its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA is engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or selling, either directly or indirectly, through third parties and/or related entities, the Class Vehicles. FCA engages in continuous and substantial business in Michigan.

## FACTUAL ALLEGATIONS

### A.   Automobile Infotainment Systems

163.   As connectivity, vehicle safety, and an enhanced in-vehicle user experience became a priority for consumers, automotive manufacturers began building in-vehicle infotainment systems to connect with all smart automotive technologies and integrate them with each other to provide a superior driving experience.[2] These systems are now ubiquitous.

---

[2] Anshul Saxena, *Everything You Need to Know About In-Vehicle Infotainment Systems,* EINFOCHIPS BLOG (June 19, 2024), https://www.einfochips.com/blog/everything-you-need-to-know-about-in-vehicle-infotainment-system/. (Exhibit 1).

164.    Infotainment is a catch-all term that covers the entire gamut of in-vehicle technology. The word itself is a contraction of "information" and "entertainment," which accurately conveys the purpose and function of an infotainment system.[3]

165.    Infotainment systems are typically controlled either by a mouse-style system with a dial-controller mounted between the two front seats, or through a large central touchscreen mounted on the dashboard.

166.    In some configurations, the infotainment system can be further designed to include control functions, such as buttons, on the steering wheel for optimal safety and control for the driver.

167.    There is virtually limitless information that can be displayed to the driver. For example, vehicle infotainment systems tend to display data such as instant fuel consumption, average fuel consumption, average speed, outside temperature, miles traveled, etc. Some high-end vehicles have infotainment systems that display in-depth data about the car's behavior, including g-force generated during cornering, braking and acceleration, rate of pitch and yaw, and acceleration times.[4]

---

[3] Haynes.com, *What Is Car Infotainment (and How Does It Work),* available at https://haynes.com/en-gb/tips-tutorials/what-car-infotainment-and-how-does-it-work (last visited June 17, 2024). (Exhibit 2).
[4] *Id.*

168.   The entertainment side of infotainment systems is similarly vast, with some systems allowing the driver to receive broadcasted radio or connect a music player using either Bluetooth or a USB connection.

169.   To provide such robust functions to a driver, an infotainment system must work in conjunction with many other in-vehicle and external systems. The main components of an infotainment system are the integrated head-unit, digital signal processors and graphic processing units, operating systems, network protocol support, and connectivity modules, and digital instrument clusters.[5]

170.   Infotainment systems also require operating systems that can support the display and graphic connectivity, convenience functions, and downloadable software applications to integrate new functions in the system. Common operating systems in infotainment systems are Android, Linux, QNX, and Windows. The operating system requires network protocol support, which allows the electronic hardware components of the infotainment system to communicate with each other.

171.   Infotainment systems typically encompass GPS, Wi-Fi, and Bluetooth, all of which include connectivity modules that help establish services like navigation, internet connectivity, and smartphone integration within the infotainment system.

---

[5] Saxena, *supra* note 3.

### B.      Evolution of the Uconnect

172.   In 2003, Chrysler Group LLC, a predecessor of FCA, was the first North American automaker to offer Bluetooth technology, and what would eventually be known as Uconnect made its debut in the 2004 Chrysler Pacifica.[6]

173.   Starting with 2009 models, Uconnect displayed a collection of connectivity technologies including phone, navigation, entertainment, and Wi-Fi features. Later on, live TV became available, where each passenger screen could showcase different programs for passengers to watch.[7]

174.   Uconnect Access was a significant platform addition to 2013 models. The cloud-based subscription service offered built-in Wi-Fi technology, improved voice recognition, text message receipt and response, and app-synced controls such as for door locks and remote engine starting. Added safety and security features included single-button emergency response, roadside assistance, and theft alerts. In 2015, vehicles began featuring components such as location and destination services.

175.   Uconnect 4 was officially announced in early 2016, which would ultimately include Android Auto and Apple CarPlay integration. First available in the 2017 Chrysler 300, Dodge Challenger, and Dodge Charger, the smartphone compatibility was offered with 8.4-inch touchscreens. Uconnect 4 also featured more

---

[6] Beverly Braga, *What Is Uconnect 5,* J.D. POWER (May 19, 2020), https://www.jdpower.com/Cars/Shopping-Guides/what-is-uconnect-5. (Exhibit 3).
[7] *Id.*

processing power, faster start-up times, improved touchscreen response, and higher screen resolutions.

176.    Uconnect 5 debuted in the 2021 Chrysler Pacifica and FCA promised the system would be faster, stronger, and smarter than ever before.[8]

177.    Prior to its release, FCA previewed the Uconnect 5 to be "…a faster, easier-to-use experience with upgraded processing power and display technology as well as a more robust operating system; it will also include wireless Android Auto and Apple CarPlay connection."[9]

178.    A press release, issued by FCA on January 27, 2020, stated that the "Uconnect 5 is more connected, helpful, content rich and adds greater personalization, making it the most advanced Uconnect system ever."[10]

179.    FCA stated that the Uconnect 5 was now scalable across all of its brands.[11]

---

[8] Jennifer Geiger, *What Is Uconnect and Is Uconnect Worth It?,* CARS.COM (May 2, 2020), www.cars.com/articles/what-is-uconnect-and-is-uconnect-worth-it-421325/. (Exhibit 4).
[9] *Id.*
[10] Press Release, PR Newswire, FCA's All-New Uconnect 5 Global Platform Is the Most Advanced System Ever: Powerful, Personalized, Connected and Easy to Use (Jan. 27, 2020), https://www.prnewswire.com/news-releases/fcas-all-new-uconnect-5-global-platform-is-the-most-advanced-uconnect-system-ever-powerful-personalized-connected-and-easy-to-use-300993133.html. (Exhibit 5).
[11] *Id.*

180.   Vince Galante, Uconnect 5's chief designer, stated "One of the first things we did was to grow the team … We have transportation and product designers, people who are experts in interaction, and people from the entertainment and gaming industries that can show us new ways to use three dimensions to visualize things. We also have people on staff with web and mobile experience and people with psychology backgrounds, so there's a really wide range of skill sets that help prepare us for this new world and the things we're working on going forward."[12]

181.   FCA confirmed that Uconnect 5 would be more powerful than the previous version. The hardware in the Uconnect 5 had been upgraded to have enhanced processing power, reaction speed, and memory.[13] In a press release, FCA announced that "the all-new Uconnect 5 is more connected, helpful, content rich and adds greater personalization, making it the most advanced Uconnect system ever. With future growth in mind, the advanced Uconnect 5 architecture is now scalable across all FCA brands and preps for the integration of advanced technology."[14]

---

[12] Antuan Goodwin, *A deeper look at Chrysler's Uconnect 5: More power, smarter design,* CNET.COM (April 29, 2020, 5:00 A.M.), https://www.cnet.com/roadshow/news/uconnect-5-design-preview/. (Exhibit 6).
[13] Press Release, Stellantis, FCA's All-New Uconnect 5 Global Platform Is the Most Advanced Uconnect System Ever: Powerful, Personalized, Connected and Easy to Use (Jan. 26, 2020), https://media.stellantisnorthamerica.com/newsrelease.do?id=21506&mid (Exhibit 7).
[14] *Id.*

182.   Uconnect 5 also features support for multiple displays such as rear-seat entertainment or other secondary displays.[15]

183.   Uconnect 5 was marketed to have smartphone integration with improved Bluetooth radios that allow two phones to connect simultaneously as well as wireless support for both Android Auto and Apple CarPlay.[16]

184.   "If you look at all of the generations leading up to Uconnect 5, you'll see that it's been an evolution," Galante said. "We really are proud of the Uconnect system, the ease and how much it is a pleasure for our customers to use. So, we didn't want to totally blow it up, but we definitely wanted to make sure that it had a fresh new look."[17]

185.   As discussed herein, these improvements did not resolve the malfunctions in previous Uconnect versions. Uconnect 5 continues to be prone to problems.

**C.   The Defective Uconnect System in the Class Vehicles**

186.   The Class Vehicles' infotainment system contains a defect that causes multiple features (e.g., the navigation system, audio system, backup camera) to malfunction or become inoperable.

---

[15] Goodwin, *supra* note 13.
[16] Braga, *supra* note 7.
[17] Goodwin, *supra* note 13.

187.   Because the Class Vehicles' infotainment systems are responsible for a wide variety of vehicle functions (including navigation, audio, video, hands-free phone, backup cameras, etc.), the Defect causes a wide range of problems for the Class Vehicles. For instance, the Defect can cause the entire head unit to refuse to power on or lag when the Vehicle's engine is initially started, as well as while the Vehicle is in motion, thereby posing a serious distraction to the driver.

188.   The Defect also interferes with the driver's ability to use the Bluetooth calling feature advertised by FCA.

189.   These problems pose a safety risk because when the system malfunctions, unexpected audio or video—or a blank or glitching infotainment system—can cause the driver to become distracted while the Vehicle is in motion.

190.   Upon information and belief, the Defect also causes the Vehicles' backup cameras to malfunction. Backup cameras are a critical safety feature in automobiles. Back-over crashes kill hundreds of people each year and injure thousands more.[18] Recognizing the danger posed by back-over crashes, in 2008 Congress passed the Cameron Gulbransen Kids Transportation Safety Act of 2007, requiring regulators to

---

[18] *See*, Nathan Bomey, *Backup cameras now required in new cars in the U.S.*, USA TODAY (May 2, 2018, 8:14 A.M.), https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/. (Exhibit 7).

enact measures requiring the adoption of technology to improve rearview visibility, which was finally embodied in Federal Motor Vehicle Safety Standard Number 111.

191.    The Cameron Gulbransen Kids Transportation Safety Act of 2007 states that the reason for requiring a rearview camera is "to reduce death and injury resulting from backing incidents, particularly involving small children and disabled persons." 122 Stat. 639, 640. Accordingly, functioning backup cameras are a requirement of baseline vehicle functionality and a minimum level of quality in the Vehicles.

192.    The failure or freezing of the backup camera and/or its display in the Vehicles due to the Defect can result in back-over accidents and backup collisions that pose a threat to safety, especially with respect to young children.

193. FCA has long known or should have known of the Vehicles' infotainment system problems from multiple sources. These sources include through presentation of the Vehicles to dealerships for Defect-related Vehicle repairs; pre-release design, manufacturing, and testing data; consumer complaints made directly to FCA, collected by the NHTSA, and/or posted on public online forums; and aggregate data and complaints from authorized dealers and other sources.

194.    Yet, FCA failed to disclose—and actively concealed—the Defect from the public, and continued to manufacture, distribute, and sell the Vehicles without disclosing the Defect to consumers prior to purchase or lease.

195. In addition, FCA did not receive information about the Vehicles' defective infotainment systems in a vacuum. Instead, FCA already had a long history of trying to correct similar defects in earlier generations of its Uconnect systems. For the first generation of Uconnect, FCA issued two manufacturer communications since its release,[19] seven for the second generation since its release,[20] 14 for the third generation since its release,[21] and at least 17 TSBs, manufacturer communications, or recalls for the fourth generation since its release.[22]

---

[19] NHTSA ID Number 10139704; Manufacture Communication Number 08-069-14, which superseded Service Bulletin 08-014-06 dated March 16, 2006.

[20] NHTSA ID Number 10121846; NHTSA ID Number 10140254; NHTSA ID Number 10058299; superseding Service Bulletin 08-055-15; NHTSA ID Number 10062148; superseding Service Bulletin 08-028-14 and replacing Service Bulletin 08-050-13.

[21] NHTSA ID Number 10166584, superseding Service Bulletin 08-080-18; NHTSA ID Number 10121797, superseding Service Bulletin 08-055-17; NHTSA ID Number 10121670, superseding number 68234120A; NHTSA ID Number 10159965, superseding Service Bulletin 08-114-15; NHTSA ID Number 10074618, superseding Service Bulletin 08-033-15 REV.A; NHTSA ID Number 10144865, superseding Service Bulletin 08-066-14; NHTSA ID Number 10139696, superseding Service Bulletin 08-030-14.

[22] August 31, 2016, GPOP – Issue Review System for Part Number 682271688A$; June 28, 2017, GPOP – Issue Review System 9003749; Service Bulletin 08-007-17 REV.A; Service Bulletin 08-007-17 REV.C; Service Bulletin 08-007-17 REV.E; Service Bulletin 08-007-17 REV.F; Service Bulletin 08-007-17 REV.G; Service Bulletin 08-016-19; Service Bulletin 08-016-19 REV.A; Service Bulletin 08-016-19 REV.B; Service Bulletin 08-016-19 REV C; Service Bulletin 08-016-19 REV.D; Service Bulletin 08-016-19 REV.E; Service Bulletin 08-016-19 REV.F; May 15, 2019, GPOP – Issue Review System 9003710; May 15, 2019, GPOP – Issue Review System 9003596.

196.   It is also standard practice for automobile manufacturers to engage in extensive pre-sale testing of their vehicles. FCA did so for the defective Vehicles and tested the operation of the infotainment systems prior to selling the defective Vehicles. This pre-sale testing replicated actual consumer use of the Uconnect infotainment system, including over established periods of time, and thoroughly tested the features of the system. Thus, the testing would have necessarily revealed the Defect to FCA.

197.   Given the immediacy, frequency, and duration of consumer complaints about the infotainment system contained in the Vehicles, FCA learned or should have learned about the Defect before the Vehicles were taken to market.

198.   Federal regulations require automobile manufacturers to build vehicles that comply with the Federal Motor Vehicle Safety Standards (49 C.F.R. § 571). The existence of these standards necessarily requires FCA to extensively test its vehicles prior to selling them. During the course of these and other quality validation testing conducted by its engineers prior to their sale, FCA became aware of the defective wiring harness.

199.   FCA also knew or should have known of the Defect based on the raft of complaints it received directly from consumers. The large number of complaints, and the consistency of their description of the infotainment system failures, alerted FCA to the Defect.

200.   FCA has access to the full universe of complaints it received regarding the infotainment system. However, upon information and belief, many Vehicle owners who experienced one or more of the infotainment system Defect manifestations complained to FCA. In fact, consumer complaints posted on publicly available forums reflect that Defendant received many such complaints directly from Vehicle owners (all *sic*):

- Screen Froze While Driving and Prevented Back Up Camera From Working. I Have Taken It to The Dealer Multiple Times For This Issue And They Stated They Can Not Duplicate It So No Action Was Taken.

- Brand new car purchased on July 12, 2023, with 84 miles. In 19 days the car has been in service for 3 days to date, left stranded with all the listed issues. 1. Navigation screen randomly goes blank/black while driving 2. Audio bluetooth connection randomly not allowing me to hear or be heard by caller 3. Rear ac system is not blowing air, even when front ac is set to lowest setting 4. Cell wireless charging blue light, but there is no actual charging happening 5. Usb plugin not actually charging 6. Driver assist lanes disappearing 7. Auto drive setting stuck on d2 while driving 8. Acceleration became erratic, to the point where the car would not start 9. Randomly slow to break and accelerate. 10. Average mpg is between 15 and 16 11. Driver's dashboard becomes erratic, and dimly.

- The uconnect 5. 0 screen (which controls all safety and operating systems) and system continues to malfunction with a black screen. This seems to happen more frequently when the car is put into reverse and the backup camera is activated. There have also been times when the screen freezes requiring a "reboot". Thus when malfunctions occur, there is no backup camera nor is there any ability to operate safety systems. This seems to be occurring every single day. So far dealer has been unable to replicate problem and thus cannot repair it.

- The uconnect screen in a 2023 Jeep Grand Cherokee intermittently stops working, freezes, or is non-responsive when touched when the car is started. It has only happened when the car is started, not while driving.

This is a problem as I rely on the rear camera view to be certain no one is walking or driving behind the car when I back out the garage and my view is limited. Nothing shows on the screen. I can deal with no media showing but not no rear camera view. Late yesterday, I started the car in town and the screen just showed an icon with a radio and fm on it. (attached photo) I've never seen that icon before. There was no sound, no view when the car was in reverse, and no response to my touching anywhere on the screen to change it. I couldn't access the fan direction, media, or anything that should have shown on the screen. This has happened over 3 times since I purchased the car 1/3/23. After driving 15 minutes, it still did not come on. At my destination, I turned the car off and on several times to see if it would re-set itself. The screen was blank each time I restarted the car. (photo attached) 3 hours later, I started the car and the screen showed the whole system being re-booted. It was like a computer screen that freezes and has to be totally restarted. It turned itself off. However, this was hours after the incident. This morning, it worked fine, again. I have contacted a local Jeep dealer to check on it. The first appointment available is a week away. I brought up the safety recall 58a about the steering system possibly failing causing a crash. I was told to not worry if I'm not hearing any 'clunking' noise. They will also inspect the recall item with the steering in a week. I use my car for business which caused me to be concerned. I don't want to have an accident with clients in the car.





<sup>24</sup>



201.   As demonstrated through the above examples, Class Vehicle owners and lessees have complained directly to dealers on numerous occasions regarding the

failures of the infotainment system. Such persistent evidence coming directly from consumers should have alerted Defendant to the Defect.

202.  Upon information and belief, FCA closely reviews Chrysler, Ram, Jeep, Dodge, and other FCA-branded and FCA-related automobile message boards, consumer websites, complaints on the NHTSA website, and other websites and sources relating to its vehicles and defects, complaints, or other issues pertaining to the FCA's vehicles, including the Class Vehicles.

203.  FCA specifically monitors customers' complaints made to NHTSA. Federal law requires automakers like FCA to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

204.  Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for complaints regarding their automobiles as part of its ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.*

205.  Class Members have repeatedly reported disturbing failures to the NHTSA. This frequently involves screens going black, loss of navigation, radio

disruptions, and loss of backup camera functionality. The following are complaints

reflecting the safety risk described above[25]:

> Date of Complaint: February 15, 2024
> Date of Incident: November 1, 2023
> NHTSA ID No.: 11572247
> VIN: 1C4SJVGP1PS****
> Vehicle Type: 2023 Jeep Grand Wagoneer
>
> Summary of the Complaint: "I am writing to report a **_significant safety concern with the Uconnect system in my Jeep_**, which has been malfunctioning for the past four months. **_The system's failure to recognize voice commands and manage remote commands compromises the vehicle's safety features, including hands-free calling and potentially emergency assistance services._** This issue is covered under warranty, yet despite repeated attempts to have it addressed by Jeep, there has been no resolution. **_The malfunctioning Uconnect system, crucial for safe vehicle operation by minimizing driver distraction, is not responding correctly, indicating a possible hardware or software failure_**. Given the importance of such systems for vehicle safety and the refusal of the manufacturer to correct the problem under warranty, I am seeking your intervention to ensure the issue is adequately addressed. I believe this could represent a broader safety issue that may affect other drivers and request that the NHTSA investigate the matter further to ensure vehicle safety is not compromised."

> Date of Complaint: January 24, 2024
> Date of Incident: March 18, 2023
> NHTSA ID No.: 11453203
> VIN: 1C6SRFFT5NN****
> Vehicle Type: 2022 Ram 1500
>
> Summary of Complaint: "**_Navigation not working._** I am [in] fear of my life because…I could [have] died. I [have] been trying Dodge Ram and Uconnect to fix this problem for almost a year and [they] tell me the part [is] on back]order with no time frame to fix it."

---

[25] NHTSA, https://www.nhtsa.gov/recalls (last visited June 19, 2024). (Exhibit 9).

Date of Complaint: August 4, 2023
Date of Incident: November 14, 2022
NHTSA ID No.: 11536491
VIN: 1C4RJHBG7P8****
Vehicle Type: 2023 Jeep Grand Cherokee

Summary of Complaint: "***The [U]connect system on this vehicle locks up, glitches and is unresponsive. This makes the hands-free function for cell phone use unreliable at best, as well as all touchscreen functions inoperable***. ***The problems with the [U]connect systems make driving the car very distracting and potentially unsafe at times.*** These problems have been inspected by the dealership service department and confirmed not to be normal. ***The dealership service technicians have attempted to fix these problems four times by replacing two radios, a touchscreen and reloading software. None of these attempts have been successful.*** The [U]connect system has had these issues starting the first week of ownership Nov 2022."

Date of Complaint: June 20, 2023
Date of Incident: June 11, 2023
NHTSA ID No.: 11527988
VIN:  3C6UR5DL4NG****
Vehicle Type: 2022 Ram 2500

Summary of Complaint:  "Android auto not connecting to Uconnect."

Date of Complaint: June 15, 2023
Date of Incident: June 15, 2023
NHTSA ID No.: 11527300
VIN:  1C4SDJH92MC****
Vehicle Type: 2021 Dodge Durango

Summary of Complaint: "***An error pop up occurs frequently which blocks the screen (including the backup camera view) until cleared***. The error message says "Uconnect Box requires service. Please visit an authorized dealer" This pop up occurs at random and can happen several times in a row. ***The spontaneity of the error means it can suddenly cover the backup camera view as you are backing up.***"

Date of Complaint: May 26, 2023
Date of Incident: May 25, 2023
NHTSA ID No.: 11524037
VIN:  1C4RJHBGXPC****
Vehicle Type: 2023 Jeep Grand Cherokee

Summary of Complaint: "***The Uconnect screen in a 2023 Jeep Grand Cherokee intermittently stops working, freezes, or is non-responsive when touched when the car is started.*** It has only happened when the car is started, not while driving***. This is a problem as I rely on the rear camera view to be certain no one is walking or driving behind the car when I back out the garage and my view is limited.*** Nothing shows on the screen. I can deal with no media showing but not no rear camera view. Late yesterday, I started the car in town and the screen just showed an icon with a radio and FM on it. I've never seen that icon before. There was no sound, no view when the car was in reverse, and no response to my touching anywhere on the screen to change it. I couldn't access the fan direction, media, or anything that should have shown on the screen. This has happened over 3 times since I purchased the car 1/3/23. After driving 15 minutes, it still did not come on. At my destination, I turned the car off and, on several times, to see if it would re-set itself. The screen was blank each time I restarted the car. 3 hours later, I started the car and the screen showed the whole system being re-booted. It was like a computer screen that freezes and has to be totally restarted. It turned itself off. However, this was hours after the incident. This morning, it worked fine, again. I have contacted a local Jeep dealer to check on it.

Date of Complaint: May 17, 2023
Date of Incident: May 3, 2023
NHTSA ID No.: 11522532
VIN:  3C4NJDBB0NT****
Vehicle Type: 2022 Jeep Compass

Summary of Complaint: "I have had my Jeep for 13 months and suddenly the digital cluster display on the dashboard and the Uconnect tablet are so dim that during the day they are unable to be seen. I am unable to see my fuel gauge, or any vehicle warning icons that may appear. This is a HUGE safety issue**. *I am also unable to use the onboard navigation with the Uconnect tablet*** which is one of the things that I love about my Jeep. ***I took it to the dealership and they showed me a Jeep bulletin dated September/2022 addressing this issue (case number:S2208000157) stating***

*"engineering is investigating a service solution" and was informed that there is currently no fix for this problem even though it is very common in the 2022 Jeep Compass. This is unacceptable."*

Date of Complaint: March 8, 2023
Date of Incident: November 10, 2022
NHTSA ID No.: 11510890
VIN:  3C6MRVJG8PE****
Vehicle Type: 2023 Ram Promaster

Summary of Complaint: "1: MPH randomly changes to KM/h on the instrument panel and Uconnect radio settings. 2: *Automatic Parking brake keeps re-enabling on the Uconnect radio settings when it has been set to disabled*. 3.SiriusXM radio starts back at station 1 XM Preview when van is started up. 4. Van will sometimes lock automatically by itself without permission with the vehicle off. 5. Other: *No matter what settings I set the vehicle at overtime they keep reverting back to whatever they were originally at. 6. Soft reset and Hard reset were performed with no prevail and issues are still present*. No software updates are available as well."

Date of Complaint: December 19, 2022
Date of Incident: December 19, 2022
NHTSA ID No.: 11498154
VIN:  3C4NJDDB9NT****
Vehicle Type: 2022 Jeep Compass

Summary of Complaint: "There is a known issue with multiple 2022 Jeep Compass trims and models that, after long periods of driving (about an hour), the volume for all components utilizing sound becomes barely audible even at max volume. This affects all warning systems including blind spot, lane departure, etc. Upon turning off the vehicle for long periods of time (a few hours) the volume will return, but the issue will occur again if driving for an hour plus with short stops. Jeep has acknowledged the concern for over a year on Jeep forums and dealers are not helpful regarding the issue. *Jeep states there will be an update to the Uconnect system controlling audio functions in Q4 2022. But Jeep has yet to release an update with 2 weeks left to go in the year despite knowing of the issue since end of 2021. I have additional concerns for safety as I have to disengage hands free audio during long drives due to the volume issue causing further distraction and complications*

58

*on top of not having audio for any other integrated components (like gps, radio, etc.) In addition to the safety features.*"

206.   As discussed in this complaint, FCA was well aware that its previous Uconnect technology routinely malfunctioned, and was also well aware of similar problems arising in the Vehicles installed with Uconnect 5, as reflected in the multiple technical TSBs that it issued.

207.   Based on publicly available information, these are the relevant TSBs, manufacturer communications and/or recalls issued by FCA in chronological order. As noted before, none of the TSBs lead to a permanent resolution of the Defect. The TSBs issued by FCA due to Defect are shown below.

208.   In January 2022, Defendant identified problems with the Uconnect 5 voice recognition options.

> Case Number: S2008000185 – Rev B.
> Release Date: January 2022
> Symptom/Vehicle Issue: Uconnect 5 Voice Recognition Options
> Diagnosis: Customer may complain that Voice Recognition not recognizing commands or changing stations. Verify what type of command is being used by the customer.
> Verify what form of Voice Recognition is being used: Short press from steering wheel, Long press for Siri or Android Auto, Wakeup Word, Amazon Alexa. See figure 1 below for best method.
> The Midline radio UBG/UEG does not include standard VR operation. The VR button can still be used for CarPlay and Android Auto if pressed and held to activate.

209. On March 4, 2022, Defendant identified navigation issues in some 2022 Chrysler Pacificas.

> 353500 EQUIPMENT: ELECTRICAL: NAVIGATIONAL SYSTEM(GLOBAL POSITIONING SYSTEM)
>
> RECORD_ID: 3490221
> Bulletin Number: S2208000061
> Replacement Service Bulletin Number: N/A
> NHTSA Item Number: 10212284
> Component Name: 353500 EQUIPMENT: ELECTRICAL: NAVIGATIONAL SYSTEM(GLOBAL POSITIONING SYSTEM)
> Make: CHRYSLER
> Model: PACIFICA
> Year: 2022
> Summary: Navigation Crashes, Freezes, or Displays Loading Message

210. On March 17, 2022, Defendant identified issues with camera screens in some 2022 Chrysler Pacificas.

> 118320 ELECTRICAL SYSTEM: ADAS: DRIVER MONITORING: CAMERA/SENSOR
>
> RECORD_ID: 3490980
> Bulletin Number: S2208000036
> Replacement Service Bulletin Number: N/A
> NHTSA Item Number: 10212325
> Make: CHRYSLER
> Model: PACIFICA
> Year: 2022
> Summary: Camera Blue/Blank Screen Recovery And Diagnosis

211. In September 2022, Defendant identified wireless connectivity problems.

Case Number: S228A000026
Symptom/Vehicle Issue: Static, Crackle Or Buzz In Wireless Connectivity Mode Only
Discussion: The customer may observe Static, Crackle Or Buzz In Wireless Connectivity Mode Only.

212.  In September 2022, Defendant identified a Uconnect box error in its vehicles.

Case Number: S228A000003 – REV. A
Symptom/Vehicle Issue: Uconnect Box Error Message On Radio Screen And Diagnostic Trouble Code (DTC) code B22A9-96 Set
Discussion: The customer may report "Uconnect Box requires service" error popup on radio screen every time the vehicle starts.

213.   In September 2022, Defendant disclosed that the Uconnect 5 radio was not completing a radio software update.

Case Number: S228A000025
Release Date: September 2022
Symptom/Vehicle Issue: Harman R1H Uconnect 5 Radio Software Flash Error Codes
Discussion: Radio will not complete a radio software update. The radio displays one of the following error codes. Follow the recommended steps in the table to resolve the concern.

214.  On January 24, 2023, Defendant identified a black screen display malfunction in the Uconnect 5.

Case Number: 08-175-22 REV. A
REFERENCE: TSB: 801723 GROUP 08 Electrical
VEHICLES AFFECTED:

NOTE: This bulletin applies to vehicles built on or after September 12, 2022 (MDH 0912XX) and on or before

October 14, 2022 (MDH 1014XX) equipped with:
Uconnect 5 W 8.4" Display and Uconnect 5 W NAV 8.4" Display
(Sales Codes UBF, UEF, UBL and UEL).
Uconnect 5 W NAV 10.1" Display (Sales Codes UBN and UEN).
Uconnect 5 W NAV 12.0" Display (Sales Codes UBQ and UEQ).
CUSTOMER SYMPTOM: Battery drain after hooking up WiTech.
Black display screen comes on during start up. (Rearview camera
functions normally).[26]

215.   On February 14, 2023, Defendant identified several issues with the

Uconnect 5 in some of its Rams, including blank screens, non-responsive radio,

and audio disruptions.

REFERENCE: TSB: 08-044-23 GROUP 08 – Electrical
VEHICLES AFFECTED: 2022 - **2023** (DT) RAM 1500 Pickup
2022 - **2023** (DJ) RAM 2500 Pickup 2022 - **2023** (D2) RAM
3500 Pickup 2022 - **2023** (DD) RAM 3500 Cab Chassis 2022 -
**2023** (DF) RAM 3500

Customers may experience one or more of the following: • **Blank
screen (Rear view camera is not affected and will still function
normally).** • Battery drain. • Radio resets (Rear view camera will still
function normally). • Wireless connectivity device disconnect. •
CarPlayT icon does not appear in device manager. • Climate icon
missing. • Audio disruptions. • SXMT inoperative. • Audio muted. •
Passenger screen blank. • Passenger screen apps missing. • Missing
profiles icon. • Instrument Panel Cluster (IPC) displays incorrect audio
source. • Radio is slow to respond. • Trailer tire pressure configurations
deleted. • Steering wheel controls skipping SXMT channels. Recent
calls not displayed. • Phone audio playing with ignition off. The
following improvements are also included with this update:
- Apple CarPlayT and Android AutoT improvements.
- Voice Recognition (VR) command improvements.
- Uconnect phone improvements.

---

[26] As discussed herein, this, and other similar statements, appear baseless, given
Plaintiffs, and other individuals' experiences, regarding rearview cameras.

- FOTA improvements.
- Passenger screen camera app improvements.
- Icon size/layout improvements.
Cause: Radio Software

216. On February 15, 2023, Defendant identified a black display in the Uconnect 5 screen for the 2023 RAM 1500 Pickup.

REFERENCE: TSB: 08-052-23 GROUP 08 Electrical
VEHICLES AFFECTED: 2023 (DT) RAM 1500 Pickup
This bulletin applies to vehicles built on or after November 26, 2022 (MDH 1126XX) and on or before December 05, 2022 (MDH 1205XX)
equipped with one of the following radios:
Uconnect 5 W NAV 12.0" Display (Sales Codes UBQ, UEQ, UFQ or UPQ).
Uconnect 5 W 8.4" Display and Uconnect 5 W NAV 8.4" Display (Sales Codes , UBL, UEL, UFL or UPL).

CUSTOMER SYMPTOM:
Battery drains after hooking up WiTech.
Black display screen comes on during start up. (Rearview camera functions normally).
CAUSE: Radio Software

217. On February 16, 2023, Defendant identified a Uconnect 5 "box" error in some 2022 Chrysler Pacificas.

280000 BACK OVER PREVENTION
RECORD_ID: 4529804
Bulletin Number: S2108000015
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10247955
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: Uconnect Box Require Service Message

63

218.   On February 17, 2023, Defendant identified several problems in some

2022 Chrysler Pacificas, including radio display malfunctions.

> 180000 VEHICLE SPEED CONTROL
> RECORD_ID: 4503569
> Bulletin Number: 0805323
> Replacement Service Bulletin Number: N/A
> NHTSA Item Number: 10248024
> Make: CHRYSLER
> Model: PACIFICA
> Year: 2022
>
> Summary: Radio S26.17 USB Software Update The customer may describe the following: Cluster and display do not shut off with engine off, battery drain, SXM radio shows one station on screen but is playing a different station, navigation inoperative, black or blank radio screen (Rear View Camera (RVC) will still function normally), radio lockup (RVC will still function normally), no verbal warnings on navigation, surround sound inoperative, Blu-ray DVD unavailable, listen in/Mirror feature inoperative, PHEV radio does not turn off when opening door or after charging, audio overlap between sources, radio does not recognize the vehicle is in park. No keyboard pop up, vehicles setting are hidden, radio presets are not saving, audio mute on calls, radio resets (Rear view camera will still function normally),  radio screen freezes (RVC will still function normally), audio disruptions, wireless connectivity device disconnect, wireless connectivity disconnecting, CarPlay icon does not appear in device manager, climate icon missing., SXM inoperative, audio muted, missing profiles icon, cluster displays incorrect audio source, radio is slow to respond, steering wheel controls skipping SXM channels, recent calls not displayed, and phone audio playing with ignition off. This bulletin involves inspecting the software level and updating the software to S26.17.

219.   On February 17, 2023, Defendant identified several problems with the

Uconnect 5 in some 2022 Chrysler Pacificas, including blank screens.

REFERENCE: TSB: 08-053-23
Date: February 17, 2023
VEHICLES AFFECTED: 2022 (RU) Chrysler Pacifica
The RSU portion of this bulletin only applies to vehicles built on or after August 26, 2022 (MDH 0826XX) and on or before September 29, 2022
(MDH 0929XX) equipped with:
Uconnect 5 Nav w/10.1" Display (USA) (Sales Code UBN).
Uconnect 5 Nav w/10.1" Display (CAN) (Sales Code UEN).
Uconnect 5 w/10.1" Display (USA) (Sales Code UBG).Uconnect 5 w/10.1" Display (CAN) (Sales Code UEG).
Uconnect 5 w/10.1" Display (MEX) (Sales Code UFG).
Uconnect 5 Nav w/10.1" Display (MEX) (Sales Code UFN)

CUSTOMER SYMPTOM:
The customer may describe the following:
Cluster and display do not shut off with engine off.
Battery drain.
SXM™ radio shows one station on screen but is playing a different station.
Navigation inoperative.
Black or blank radio screen (Rear View Camera (RVC) will still function normally).
Radio lockup (RVC will still function normally).
No Verbal warnings on navigation.
Surround sound inoperative.
Blu ray™ DVD unavailable.
Listen in/Mirror feature inoperative.
PHEV radio does not turn off when opening door or after charging.
Audio Overlap between sources.
Radio does not recognize the vehicle is in park. No keyboard pop up, vehicles setting is hidden.
Radio presets are not saving.
Audio mute on calls (Phone, SOS and Ecall).
Radio Resets (Rear view camera will still function normally).
Radio screen freezes (RVC will still function normally).
Audio disruptions.
Wireless connectivity device disconnects.
Wireless connectivity disconnecting.

CarPlay® icon does not appear in device manager.
icon missing.
SXM™ inoperative.
Audio muted.
Missing profiles icon.
Cluster displays incorrect audio source.
Radio is slow to respond.
Steering wheel controls skipping SXM channels.
Recent calls not displayed.
Phone audio playing with ignition off.
The following software enhancements are available:
Uconnect Phone improvements.
Apple CarPlay® and Android Auto® improvements.
Voice recognition command improvements.
FOTA enhancements.

220.   On May 3, 2023, Defendant identified radio display malfunctions in some 2022 Dodge Chargers.

353600 EQUIPMENT: ELECTRICAL: INFOTAINMENT

RECORD_ID: 4440410
Bulletin Number: S238A000021
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10240003
Make: DODGE
Model: CHARGER
Year: 2022
Summary: Radio Display Screen Blank Or Screen Cuts In And Out

221.   On June 29, 2023, Defendant identified freezing and other radio problems in some 2022 Dodge Chargers.

353400 EQUIPMENT: ELECTRICAL: RADIO/TAPE DECK/CD ETC.
RECORD_ID: 4347065

66

Bulletin Number: S238A000028
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10241035
Make: DODGE
Model: CHARGER
Year: 2022
Summary: Radio Black Screen, Freezing, Reset, Cutting Out Or Inoperative Intermittently

222.   On September 20, 2023, Defendant identified backup camera sensor malfunctions in some 2022 Chrysler Pacificas.

284100 BACK OVER PREVENTION: SENSING SYSTEM: CAMERA

RECORD_ID: 4515443
Bulletin Number: 9004452
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10248516
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: CAMERA, Rear View Prior to replacement, please contact FCA Redacted Content. If no response in 15 minutes, proceed with repair.

223.   On September 23, 2023, Defendant identified a "blue screen" malfunction in the backup camera in some 2022 Jeep Wagoneers.

110000 ELECTRICAL SYSTEM

RECORD_ID: 4440589
Bulletin Number: S2208000172
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10244417
Make: JEEP

67

Model: WAGONEER
Year: 2022
Summary: Camera Display Has a Blue Screen When Using Surround, Front, Rear, or Park Assist Camera View

224.   On October 21, 2023, Defendant identified intermittent black screens in some 2022 Jeep Wagoneers.

353400 EQUIPMENT: ELECTRICAL: RADIO/TAPE DECK/CD ETC.

RECORD_ID: 4224684
Bulletin Number: S238A000026
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10247447
Make: JEEP
Model: WAGONEER
Year: 2022
Summary: Intermittent Black Screen With Or Without Audio, Radio Resets Or Radio Locks Up At Times

225.   On October 21, 2023, Defendant identified radio malfunctions in some 2022 Chrysler Pacificas.

353400 EQUIPMENT: ELECTRICAL: RADIO/TAPE DECK/CD ETC.

RECORD_ID: 4224682
Bulletin Number: S238A000026
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10247447
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: Intermittent Black Screen With Or Without Audio, Radio Resets Or Radio Locks Up At Times

226.  On November 3, 2023, Defendant identified voice recognition malfunctions.

353600 EQUIPMENT: ELECTRICAL: INFOTAINMENT

RECORD_ID: 4521721
Bulletin Number: S2008000185
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10248861
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: Uconnect 5 Voice Recognition Options

227.  On November 10, 2023, Defendant identified audio mute problems in some 2022 Chrysler Pacificas.

353600 EQUIPMENT: ELECTRICAL: INFOTAINMENT

RECORD_ID: 4521803
Bulletin Number: S238A000055
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10248872
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: Audio Muted During A CarPlay Or Android Auto Phone Call

228.  On November 30, 2023, Defendant identified navigation display problems in some 2022 Chrysler Pacificas.

353500 EQUIPMENT: ELECTRICAL: NAVIGATIONAL SYSTEM
(GLOBAL POSITIONING SYSTEM)

RECORD_ID: 4520611
Bulletin Number: S238A000058
Replacement Service Bulletin Number: N/A
NHTSA Item Number: 10248903
Make: CHRYSLER
Model: PACIFICA
Year: 2022
Summary: Radio Navigation Displays Message, No Maps Available

229.   FCA had knowledge, or should have known, about the Defect from all of these sources (including the fact that another lawsuit was filed related to alleged defects in a prior version of the UConnect system), yet it did nothing to remedy the Defect; continued to sell Vehicles with a well-known safety issue; declined to issue a recall despite the prevalence of the issue; and has sat on its hands as its dealerships routinely decline to take action or, worse, charge class members large sums of money when they present their Vehicles for repair of the Defect after it inevitably manifests.

230.   FCA had knowledge that its omissions regarding the safety and performance of the Vehicles were misleading, yet it continued to conceal this material information regarding the Vehicles to Plaintiffs and members of the proposed classes.

231.   To date, FCA has failed to remedy the Defect and continues to sell the Vehicles despite knowledge of the Defect.

232.   To date, FCA has not been able to provide an adequate repair for the Defect, and Plaintiffs and Class Members do not know whether FCA can provide an

adequate repair for the Defect. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiffs and Class Members. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction enjoining FCA and its agents, servants, and employees, and all persons acting under, in concert with, or for it from selling or leasing the Vehicles without notice that they are subject to the Defect, and that this remains the situation.

## CLASS ACTION ALLEGATIONS

233.  This action is brought, and may properly proceed, as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

234.  Plaintiffs seek certification of the following classes (together the "Class"):

**Nationwide Class**

All persons residing in the United States who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system.

In the alternative to the Nationwide Class, Plaintiffs seek to represent each of the following state-wide classes (collectively, the "State Classes"):

**Florida Class**

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of Florida.

### Massachusetts Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the Commonwealth of Massachusetts.

### New Jersey Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of New Jersey.

### New York Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of New York.

### Oregon Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of Oregon.

### Pennsylvania Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the Commonwealth of Pennsylvania.

### Tennessee Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of Tennessee.

### Texas Class

All persons who purchased or leased a Class Vehicle equipped with a defective Uconnect 5 infotainment system in the State of Texas.

235. Excluded from the Class are FCA and its affiliates, officers, and directors; persons or entities that purchased the Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

236. Plaintiffs reserve the right, subject to additional information obtained through further investigation and discovery, to amend, expand, or narrow the foregoing definition of the Class or the State Classes.

237. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of FCA and obtainable only through the discovery process, Plaintiffs believe, and on that basis allege, that millions of impacted Vehicles have been sold and leased nationwide.

238. **Existence/Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.  whether FCA engaged in the conduct alleged herein;

    b.  whether the Uconnect systems equipped in the Vehicles are defective;

c.  whether FCA sold and leased Vehicles with pre-sale knowledge of the Defect;

d.  whether FCA knew or should have known of the Defect, and if so, how long it knew of this Defect;

e.  whether FCA knowingly failed to disclose the existence and cause of the Defect in the Vehicles;

f.  whether the Class Vehicles are unmerchantable;

g.  whether FCA breached express or implied warranties;

h.  whether FCA's conduct alleged herein violates consumer protection statutes, warranty laws, and other laws as asserted herein;

i.  whether Plaintiffs and Class Members overpaid for their Vehicles in light of the Defect;

j.  whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Vehicles' features and functionality;

k.  whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of FCA's conduct alleged herein and, if so, the amount or proper measure of those damages; and

l.  whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, restitution and/or injunctive relief.

239.   **Typicality**:  Plaintiffs' claims are typical of the claims of the Class since the Plaintiffs purchased or leased a Vehicle containing defective Uconnect systems, as did each member of the Class. Plaintiffs and Class Members were injured in the same manner by FCA's uniform course of conduct alleged herein. Plaintiffs and all Class Members have the same claims against FCA relating to the uniform conduct and uniform Defect alleged herein, and the events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and Class Members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of FCA's wrongful conduct in selling and failing to remedy defective Class Vehicles. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

240.   **Adequacy**:  Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation—including consumer fraud and automobile defect class action cases—and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their experienced counsel.

241.   **Superiority**:  A class action is superior to all other available means of fair and efficient adjudication of Plaintiffs' and Class Members' claims. The injury

75

suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by FCA's conduct. It would be virtually impossible for Class Members individually to redress effectively the wrongs done to them by FCA. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, individual Class Members can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) FCA maintains regarding its sales and leases of the Vehicles.

242. FCA has acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT
### (On Behalf of All Plaintiffs and the Nationwide Class)

243.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

244.    Congress enacted the Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 et seq., to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. The MMWA imposes civil liability on any "warrantor" who fails to comply with any obligation under a written or corresponding implied warranty. *Id.* § 2310(d)(1).

245.    Defendant's vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

246.    Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

247.    In connection with the sale and/or lease of the vehicles, Defendant supplied Plaintiffs and Class Members with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

248.    15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service

contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."

249.   Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the Defendant regularly sells FCA vehicles accompanied by written Limited Warranties.

250.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

251.   Defendant provided Plaintiffs and Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an implied warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendant warranted that the vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

252.   Defendant breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and the Class under 15 U.S.C. § 2310(d)(1). The Defect rendered the vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

253.   Because Defendant knew of the Defect at the time of the sale, it waived any opportunity to cure.

254. Plaintiffs and the Nationwide Class used their respective vehicles in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Defendant's conduct or by operation of law.

255. Plaintiffs and the Nationwide Class seek to recover damages resulting directly from Defendant's breach of its implied warranties and its deceitful and unlawful conduct described herein. These damages include, but are not limited to, overpayment for the vehicles and/or the cost to replace or fix the Uconnect 5.

256. The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

257. The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Plaintiffs and the Class seek compliance of Defendant's respective written warranties to comport with their obligations under the MMWA and with consumers' reasonable expectations. Plaintiffs and the Nationwide Class also seek to enjoin Defendant from acting unlawfully as alleged herein.

258. Plaintiffs and the Class are entitled to costs and expenses, including experts' fees and  attorneys' fees in the Court's discretion. 15 U.S.C. § 2310(d)(2).

## COUNT II

### NEGLIGENT MISREPRESENTATION
**(On Behalf of All Plaintiffs and the Nationwide Class
or, Alternatively, Each of the State Classes)**

259.   Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

260.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, or in the alternative, the State Classes.

261.   Defendant owed a duty to disclose that the Uconnect 5 was prone to malfunction and its corresponding safety hazard to Plaintiffs and Nationwide Class Members because Defendant possessed knowledge regarding the Defect and the associated risks.

262.   Defendant negligently omitted material facts concerning the defect in the Class Vehicles. As a direct result of Defendant's negligent conduct, Class Members have suffered damages.

263.   Defendant and its agents made written representations to Plaintiffs and Nationwide Class Members that the Class Vehicles were safe and reliable. Defendant had no reasonable grounds for believing these representations were true when it made them, yet it intended that Plaintiffs and Nationwide Class Members rely on these misrepresentations.

264.    The Defect is material because Plaintiffs and Nationwide Class Members had a reasonable expectation that the vehicles would not be prone to malfunctions that would expose them and their occupants to dangerous safety issues and unreliable transportation. No reasonable consumer expects a newer vehicle to contain system malfunctions.

265.    Plaintiffs and Class Members would not have purchased the Class Vehicles at the price they paid for them but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect.

266.    Plaintiffs and Class Members reasonably relied upon Defendant's negligent omissions of material facts.

267.    As a direct and proximate result of Defendant's negligent omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the presence of the defect, Plaintiffs and Nationwide Class Members have suffered an ascertainable loss and damages in an amount to be determined at trial.

## COUNT III

### BREACH OF EXPRESS WARRANTY
**(On Behalf of All Plaintiffs and the Nationwide Class
or, Alternatively, Each of the State Classes)**

268.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

269.  This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, each of the State Classes under the laws of their respective home states.

270.  Defendant is a "seller" and "merchant" as defined under the Uniform Commercial Code ("UCC").

271.  The Class Vehicles are "goods" as defined under the UCC.

272.  FCA expressly warranted that the Vehicles were of high quality and, at a minimum, would function properly. FCA specifically warranted attributes and qualities of the Uconnect systems in the Vehicles as detailed above, including with respect to performance, quality, operability, convenience, and safety.

273.  FCA also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the applicable warranty periods.

274.  FCA breached its warranties by selling to Plaintiffs and Class Members Vehicles with defective infotainment systems, which are not of high quality, and which are predisposed to fail prematurely and/or fail to function properly, presenting an unreasonable safety risk. FCA also breached its warranty by failing to provide an adequate repair when Plaintiffs and Class Members presented their Vehicles to authorized FCA dealers following manifestation of the Uconnect system Defect.

275.  These warranties formed the basis of the bargain that was reached when

Plaintiffs and other Class Members purchased or leased their Vehicles equipped with defective Uconnect systems.

276.   Plaintiffs and Class Members experienced the Uconnect system Defect within the warranty period. Despite the existence of express warranties (including but not limited to FCA's New Vehicle Limited Warranty), FCA failed to inform Plaintiffs and Class Members that the Vehicles are defective and failed to fix or eliminate the Defect.

277.   As a result of FCA's actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, costly repairs, loss of vehicles' use, diminished value, substantial loss in value and resale value of the vehicles, and other related damages.

278.   FCA was provided notice of the issues complained of herein by numerous consumer complaints made against it, the instant lawsuit, and Plaintiffs' pre-suit demand letter, within a reasonable amount of time.

279.   Plaintiffs and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

## COUNT IV

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
**(On Behalf of All Plaintiffs and the Nationwide Class
or, Alternatively, Each of the State Classes)**

280.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

281.   This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, each of the State Classes under the laws of their respective home states.

282.   FCA is a "merchant" as defined under the UCC.

283.   The Class Vehicles are "goods" as defined under the UCC.

284.   A warranty that the Vehicles were in merchantable quality and condition is implied by law in transactions for the purchase and lease of Vehicles. FCA impliedly warranted that the Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

285.   The Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used, and fall short of a minimum expectation of quality. Specifically, the Vehicles are inherently defective in that the Uconnect infotainment systems—a central component to the Vehicles that go to the Vehicles' core functionality—are prone to

a multitude of operational issues due to a common defect. The Uconnect system Defect renders the Vehicles unmerchantable.

286.   FCA was provided notice of the issues complained of herein by numerous consumer complaints made against it, the instant lawsuit, and Plaintiffs' pre-suit demand letter, within a reasonable amount of time.

287.   Plaintiff and the other Class Members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of the Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between FCA and its dealers (who are FCA's agents) and, specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

288.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class Members were injured, and are entitled to damages.

## COUNT V

### COMMON LAW FRAUD/FRAUDULENT OMISSION
### (On Behalf of All Plaintiffs and Each of the State Classes)

289.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

290.   This claim is brought by Plaintiffs on behalf of each of the State Classes under the laws of their respective home states.

291.   FCA actively, intentionally, and knowingly concealed, suppressed, and/or omitted material facts including the existence of the defect and the standard, quality, or grade of the Vehicles, and the fact that the Vehicles contain a defect and corresponding safety risk, with the intent that Plaintiffs and Class Members rely on FCA's omissions. As a direct result of the FCA's fraudulent conduct, as alleged herein, Plaintiffs and members of the Class have suffered actual damages.

292.   FCA knew at the time of sale or lease and thereafter that the Vehicles contained the Defect, omitted material information about the safety of the Vehicles, actively concealed the Defect, and never intended to adequately and permanently repair the Defect during the warranty periods. To date, FCA has not provided Plaintiffs and Class Members with an adequate repair or remedy for the Defect.

293.   FCA made material omissions concerning a presently existing or past fact. For example, FCA did not fully and truthfully disclose to its customers the true nature of the inherent Defect. A reasonable consumer would have expected that the

Uconnect infotainment system in the Class Vehicles would not be defective and pose a serious safety risk.

294.   The facts concealed or not disclosed by FCA to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price.

295.   FCA had a duty to disclose the true performance of the Class Vehicles because knowledge of the Defect and its details were known and/or accessible only to FCA; FCA had superior and exclusive knowledge and access to the facts; and FCA knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. FCA also had a duty to disclose because they made many general affirmative representations about the qualities of their vehicles, including references as to safety and general operability, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of the Vehicles.

296.   Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

297.   As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with Defect and all the resulting problems.

298.   These misrepresentations omissions were made by FCA with knowledge of their falsity, and with the intent that Plaintiffs and Class Members rely upon them.

299.   Plaintiffs and Class Members reasonably relied on FCA's misrepresentations and omissions and suffered damages as a result. To the extent that FCA's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to punitive damages.

## COUNT VI

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. § 501.201, *et seq.* ("FDUTPA")
### (On Behalf of Plainitff Brenneman, Hickman, Lake Jr. and the Florida Class)

300.   Plaintiffs Brenneman, Hickman, and Lake Jr., individually and for the Florida Class, hereby incorporate each and every allegation as though fully set forth herein.

301.   Plaintiffs Brenneman, Hickman, and Lake Jr. bring this claim on behalf of the Florida Class.

302.   Plaintiffs Brenneman, Hickman, Lake Jr., and the Florida Class Members are "consumers" within the meaning of Fla. Stat. § 501.203 (7).

303.   Defendant engages in "trade or commerce" within the meaning of Fla. Stat. § 501.203 (8) by offering for sale or lease the Class Vehicles to Plaintiffs Brenneman, Hickman, Lake Jr., and the Florida Class Members.

304.   By failing to disclose and concealing the Defect from Plaintiffs Brenneman, Hickman, Lake Jr., and the Florida Class Members, Defendant violated Fla. Stat. § 501.204 (1), by engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

305.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

306.   Defendant knew that the Uconnect 5 system was prone to malfunction since, at least, the issuance of its first generation of Uconnect, but concealed that information.

307.   In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect discussed above.

308.   Defendant's acts and practices, described herein, are unfair and in violation of Florida law, because they violate Florida public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

309.   Defendant advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendant wrongfully:

    a.   knowingly, intentionally, and/or recklessly omitted, suppressed, and/ or concealed the true value of the Class Vehicles;

    b.   engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce—marketing, advertising, and selling the Class Vehicles;

    c.   advertised the Class Vehicles with intent not to sell them as advertised; and

    d.   failed to make repairs or made repairs and provided replacements that caused Plaintiffs and the Florida Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless.

310.   Defendant had a duty to Plaintiffs Brenneman, Hickman, and Lake Jr., and the Florida Class Members, to disclose the Defect because it has the superior position to know the true state of facts about the safety defect in the Class Vehicles' Uconnect systems.

311.   As a result of Defendant's conduct, Plaintiffs Brenneman, Hickman, and Lake Jr., and the Florida Class Members, were harmed and suffered damages in that the Class Vehicles experienced and may continue to experience the Defect.

312.   Plaintiffs Brenneman, Hickman, and Lake Jr., and the Florida Class Members, are entitled to equitable relief, damages, including the diminished value of their Class Vehicles, attorneys' fees and costs, and any other relief provided by law.

## COUNT VII

### VIOLATIONS OF MASS. GEN. L. CH. 93A
### (On Behalf of Plaintiff McNeely and the Massachusetts Class)

313.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

314.   Plaintiff McNeely brings this claim on behalf of the Massachusetts Class.

315.   The Massachusetts Regulation of Business Practice and Consumer Protection Act prohibits unfair and deceptive acts or practices in the conduct of trade or commerce. Mass. Gen. L. ch. 93A, § 2(a).

316.   FCA, Plaintiff McNeely, and Massachusetts Class Members are "persons" within the meaning of ch. 93A, § 1(b).

317.   FCA engaged in "trade" or "commerce" within the meaning of ch. 93A, § 1(b).

318.   Plaintiff and other Class Members are consumers who purchased or leased a Vehicle for end use and not for resale.

319.   FCA's conduct, as described above, in misrepresenting the Vehicles' features, while omitting the fact that the Vehicles contained defective Uconnect

systems, constitutes an unfair and deceptive practice and was likely to mislead a reasonable consumer.

320. A reasonable consumer would consider the functionality of an infotainment system in a Vehicle, and defective infotainment systems, to be important when making a decision whether to purchase or lease a Vehicle. The disclosure of the Defect would have influenced prospective buyers not to enter into transactions.

321. FCA knew before the time of sale to Plaintiff and the other Class Members, or earlier, that Vehicles were equipped with defective infotainment systems that posed a safety threat to drivers, passengers, and everyone else sharing the road with the Vehicles. Through knowledge of manufacture and production of the infotainment systems/head units, internal product testing, consumer complaints, and past experience, FCA learned of the Defect. The existence and ubiquity of the Defect is illustrated by the numerous publicized consumer complaints and disputes.

322. FCA's conduct in refusing to perform the necessary repairs to Plaintiff's and Massachusetts Class Members' Vehicles constituted unfair conduct within the meaning of ch. 93A, § 2.

323. FCA's practices offend public policy, are immoral, unethical, oppressive, and unscrupulous, cause substantial injury to consumers, and pose a risk to public safety.

324.    FCA's conduct, as alleged herein, is in violation of at least the following regulations promulgated by the Massachusetts Attorney General under ch. 93A:

    a. 940 C.M.R. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

    b. 940 C.M.R. § 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

    c. 940 C.M.R. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligation arising under a warranty"); and

    d. 940 C.M.R. § 3.16(2) (providing that it is a violation of ch. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction").

325.    As a direct and proximate result of FCA's unfair and deceptive conduct, as alleged herein, Plaintiff and the other Massachusetts Class Members have suffered injury-in-fact, including the following:

a. Plaintiff and the other Class Members, in purchasing or leasing the Vehicles, received cars worth less than as represented;

b. Plaintiff and the other Class Members suffered diminution in value of the Vehicles due to the existence of the Defect in their Vehicles; and

c. Plaintiff and the other Class Members were faced with the choice or repairing their Vehicles at substantial cost and inconvenience or being without their vehicles at substantial cost and inconvenience.

326.  As a result of FCA's unfair and deceptive conduct in violation of ch. 93A, Plaintiff McNeely and the other Massachusetts Class members have suffered actual damages, including the additional cost they paid for a vehicle with a working and defect-free Uconnect system, diminution in value of the Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

327.  Had Plaintiff and the other Massachusetts Class Members been aware of the omitted and misrepresented facts, i.e., that the Vehicles they purchased and leased were defective, Plaintiff and the other Class Members would not have purchased and leased the Vehicles or would have paid significantly less for them than they actually paid.

328.   On April 22, 2024, Plaintiff McNeely sent to FCA a written demand for relief pursuant to ch. 93A, § 9(3). This demand letter was served on FCA on or around April 28, 2024. To date, FCA failed to make a reasonable offer of relief in response to the demand.

329.   Pursuant to Mass. Gen. Law, ch. 93A, § 9, Plaintiff McNeely and the other Massachusetts Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $25 for each violation. Because FCA's conduct was committed willfully and knowingly, Plaintiff and the other Class Members are entitled to recover up to three times their actual damages, but no less than two times actual damages.

330.   Plaintiff McNeely and the other Massachusetts Class Members also seek an order directing FCA to correct its violations by repairing or replacing the defective Uconnect systems in all Vehicles.

## COUNT VIII

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. §§ 56:8-1, *et seq*. ("NJCFA")
### (On Behalf of Plaintiff Sheridan and the New Jersey Class)

331.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

332.   This claim is brought by Plaintiff Sheridan on behalf of the New Jersey Class.

333.   The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

334.   At all relevant times, FCA conducted trade and commerce in New Jersey within the meaning of the NJCFA.

335.   FCA violated the NJCFA by engaging in at least the following unconscionable, fraudulent, and/or deceptive trade practices:

   a.  affirmatively representing that the Vehicles are safe and reliable, and that FCA would ensure proper performance of the Vehicles, despite knowledge about the Defect;

   b.  omitting and concealing the Defect, which was known to FCA prior to sale, as alleged herein;

   c.  selling Vehicles with pre-sale knowledge of the Defect;

   d.  failing to provide adequate warranty relief and repairs; and

   e.  forcing consumers to incur expenses caused by the Defect.

336.   Plaintiff Sheridan and the New Jersey Class Members reasonably expected that the Vehicles would not be defective. Further, Plaintiff and the New

Jersey Class Members reasonably expected FCA to honor its warranty obligations as represented to them at the time they purchased or leased their Vehicles.

337.   FCA knew, or, in the exercise of diligence, should have known, that the Vehicles contain a defect, posed a safety risk, and were not suitable for their intended and/or expected use. FCA also knew that attempted repairs and fixes would not remedy or eliminate the Defect.

338.   In failing to disclose and omitting the Defect, FCA omitted material facts it was under a duty to disclose.

339.   The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all the circumstances.

340.   Had Plaintiff and the New Jersey Class Members known about the Defect at the time of purchase, including the safety hazard posed by the Defect and the monetary cost of repair, or the true effect of FCA's warranty, they would not have bought the Vehicles or would have paid much less for them.

341.   Had Plaintiff and the New Jersey Class Members been adequately notified by FCA about the Defect, they would not have purchased or leased the Vehicles, or they would have paid less for them.

342.   As a direct and proximate result of FCA's actions, Plaintiff and the New Jersey Class Members have suffered economic damages including, but not limited to,

repair costs, loss of use of the Vehicles, substantial losses in value and resale value of the Vehicles, out-of-pocket expenses (e.g., rental cars, etc.), and other damages.

343. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiff and the New Jersey Class request monetary damages, trebled, punitive damages, injunctive and equitable relief, reasonable attorneys' fees, filing fees, and costs of suit.

344. Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

## COUNT IX

### VIOLATIONS OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT
### New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff Rothar and the New York Class)

345. Plaintiff Rothar, individually and for the New York Class, hereby incorporates each and every allegation as though full set forth herein.

346. Plaintiff Rothar brings this claim on behalf of the New York Class.

347. The New York Deceptive Trade Practices Act prohibits unfair and deceptive acts or practices in the conduct of trade or commerce. New York Gen. Bus. Law § 349.

348. Plaintiff Rothar, and New York Class Members are "persons" within the meaning of Gen. Bus. Law § 349(h).

349. FCA engaged in "business," "trade," or "commerce" within the meaning

of Gen. Bus. Law § 349(a).

350.   Plaintiff and other Class Members are consumers who purchased or leased a Vehicle for end use and not for resale.

351.   FCA's conduct, as described above, in misrepresenting the Vehicles' features, while omitting the fact that Vehicles contained defective Uconnect systems, constitutes an unfair and deceptive practice and was likely to mislead a reasonable consumer.

352.   A reasonable consumer would consider the functionality of an infotainment system in a Vehicle, and defective infotainment systems, to be important when making a decision about whether to purchase or lease a Vehicle. The disclosure of the Defect would have influenced prospective buyers not to enter into transactions.

353.   FCA knew before the time of sale to Plaintiff and the other Class Members, or earlier, that Vehicles were equipped with defective infotainment systems that posed a safety threat to drivers, passengers, and everyone else sharing the road with the Vehicles. Through knowledge of manufacture and production of the infotainment systems/head units, internal product testing, consumer complaints, and past experience, FCA learned of the Defect. The existence and ubiquity of the Defect is illustrated by the numerous publicized consumer complaints and disputes.

354.   FCA's conduct in refusing to perform the necessary repairs to Plaintiff's

and New York Class Members' Vehicles constituted unfair conduct within the meaning of Gen. Bus. Law § 349(a) and (g).

355.   As a direct and proximate result of FCA's unfair and deceptive conduct, as alleged herein, Plaintiff and the other New York Class Members have suffered injury-in-fact, including the following:

     a.   Plaintiff and the other Class Members, in purchasing or leasing the Vehicles, received cars worth less than as represented;

     b.   Plaintiff and the other Class Members suffered diminution in value of the Vehicles due to the existence of the Defect in their Vehicles; and

     c.   Plaintiff and the other Class Members were faced with the choice of repairing their Vehicles at substantial cost and inconvenience or being without their vehicles at substantial cost and inconvenience.

356.   As a result of FCA's unfair and deceptive conduct in violation of Gen. Bus. Law § 349, Plaintiff Rothar and the other New York Class Members have suffered actual damages, including the additional cost they paid for a vehicle with a working and defect-free Uconnect system, diminution in value of the Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

357.   Had Plaintiff and the other Class Members been aware of the omitted and misrepresented facts, i.e., that the Vehicles they purchased and leased were defective, Plaintiff and the other Class Members would not have purchased and leased the Vehicles or would have paid significantly less for them than they actually paid.

358.   As a direct and proximate result of FCA's violations of Gen. Bus. Law § 349, Plaintiff Rothar and the New York Class have suffered actual, concrete, and imminent injuries. Plaintiff Rothar and the other New York Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $50 for each violation. Because FCA's conduct was committed willfully and knowingly, Plaintiff and each of the other Class Members are entitled to recover up to three times their actual damages, but no more than $1,000.

359.   Plaintiff Rothar and the other New York Class Members also seek an order directing FCA to correct its violations by repairing or replacing the defective Uconnect systems in all Vehicles.

## COUNT X

### VIOLATIONS OF THE OREGON UNFAIR TRADE PRACTICES ACT
### ORS § 646.605, *et seq*. ("OTPA")
### (On Behalf of Plaintiff Silver and the Oregon Class)

360.   Plaintiff Silver, individually and for the Oregon Class, hereby incorporates each and every allegation as though fully set forth herein.

361.   Defendant is a person within the context and meaning of the OTPA, ORS § 646.605, *et seq.*

362.   Defendant made various misrepresentations to Plaintiff Silver and Oregon Class Members, and violated and continues to violate the OTPA through various deceptive acts and practices associated and related to the Uconnect 5 system as set forth above.

363.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

364.   Defendant knew that the Uconnect 5 system was prone to malfunction since, at least, the issuance of its first generation of Uconnect, but concealed that information.

365.   In the course of Defendant's business, it willfully failed to disclose—actively—concealed the Defect discussed above.

366.   Defendant's acts and practices, described herein, are unfair in violation of Oregon law because it violates Oregon public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

367.   Defendant advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendant wrongfully:

a. knowingly, intentionally, and/or recklessly omitted, suppressed, and/ or concealed the true value of the Class Vehicles;

b. engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce—marketing, advertising, and selling the Class Vehicles;

c. advertised the Class Vehicles with intent not to sell them as advertised; and

d. failed to make repairs or made repairs and provided replacements that caused Plaintiffs and the Oregon Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless.

368.   Defendant had a duty to Plaintiff Silver and Oregon Class Members to disclose the Defect because it has the superior position to know about the safety defect in the Class Vehicles' Uconnect systems

369.   As a result of Defendant's conduct, Plaintiff Silver and Oregon Class Members were harmed and suffered damages in that the Class Vehicles experienced and may continue to experience the Defect.

370.   Plaintiff Silver and Oregon Class Members are entitled to equitable relief, damages, including the diminished value of their Class Vehicles, attorneys' fees and costs, and any other relief provided by law.

## COUNT XI

**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
73 Pa. C.S.A. §§ 201-1, *et seq*. ("UTPCPL")
(On Behalf of Plaintiffs Boonie, Bostelman, and the Pennsylvania Class)**

371.   Plaintiffs Boonie and Bostelman, individually and for the Pennsylvania Class, hereby incorporate each and every allegation as though fully set forth herein.

372.   Defendant is a person within the context and meaning of the Pennsylvania UTPCPL, 73 Pa. C.S.A. §§ 201-1, *et seq.*

373.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

374.   Defendant knew that the Uconnect 5 was prone to malfunction since, at least, the issuance of its first generation of Uconnect, but concealed that information.

375.   In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect discussed above.

376.   Defendant's acts and practices, described herein, are unfair in violation of Pennsylvania law because it violates Pennsylvania public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

377.   Defendant advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendant wrongfully:

a. Knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed the true value of the Class Vehicles;

b. engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Class Vehicles.

c. Advertised the Class Vehicles with intent not to sell them as advertised and

d. Failed to make repairs or made repairs and provided replacements that caused Plaintiffs and the Pennsylvania Class members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless.

378. Defendant had a duty to Plaintiffs Boonie and Bostelman and Pennsylvania Class Members to disclose the Defect because it has the superior position to know about the safety defect in the Class Vehicles' Uconnect systems

379. As a result of Defendant's conduct, Plaintiffs Boonie and Bostelman and Pennsylvania Class Members were harmed and suffered damages in that the Class Vehicles experienced and may continue to experience the Defect.

380. Plaintiffs Boonie and Bostelman and Pennsylvania Class Members are entitled to equitable relief, damages, including treble damages and damages to

account for the diminished value of their Class Vehicles, attorneys' fees and costs, and any other relief provided by law.

## COUNT XII

**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT**
**Tenn. Code Ann. §§ 47-18- 101, *et seq*. ("TCPA")**
**(On Behalf of Plaintiff Bauman and the Tennessee Class)**

381.  Plaintiff Bauman, individually and for the Tennessee Class, hereby incorporate each and every allegation as though fully set forth herein.

382.  Plaintiff Bauman and the Tennessee Class are "consumers" within the context and meaning of the TCPA, Tenn. Code Ann.§ 47-18-101, *et seq.*

383.  Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

384.  Defendant knew that the Uconnect 5 was prone to malfunction since, at least, the issuance of its first generation of Uconnect, but concealed that information.

385.  In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect discussed above.

386.  Defendant's acts and practices, described herein, are unfair in violation of Tennessee law because it violates Tennessee public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

387. Defendant advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendant wrongfully:

    a. Knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed the true value of the Class Vehicles;

    b. engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Class Vehicles.

    c. Advertised the Class Vehicles with intent not to sell them as advertised and

    d. Failed to make repairs or made repairs and provided replacements that caused Plaintiffs and the Tennessee Class members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless.

388. Defendant had a duty to Plaintiff Bauman and Tennessee Class Members to disclose the Defect because it has the superior position to know about the safety defect in the Class Vehicles' Uconnect systems

389. As a result of Defendant's conduct, Plaintiff Bauman and Tennessee Class Members were harmed and suffered damages in that the Class Vehicles experienced and may continue to experience the Defect.

390.    Plaintiff Bauman and Tennessee Class Members are entitled to equitable

relief, damages, including the diminished value of their Class Vehicles, attorneys'

fees and costs, and any other relief provided by law.

## COUNT XIII

**VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES
CONSUMER PROTECTION ACT
Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("TDTPCPA")
(On Behalf of Plaintiff Short and the Texas Class)**

391.    Plaintiff Short, individually and for the Texas Class, hereby incorporate

each and every allegation as though fully set forth herein.

392.    The Texas Class are individuals, partnerships or corporations with assets

of less than $25 million (or are controlled by corporations or entities with less than

$25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore

"consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4)

393.    Defendant is a person within the context of the TDTPCPA. *See* Tex. Bus.

& Com. Code § 17.45(3).

394.    Defendant engaged in trade and commerce within the context of the

TDTPCPA. *See* Tex. Bus. & Com. Code § 17.46(a).

395.    The TDTPCPA prohibits "false, misleading, or deceptive acts or

practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code §

17.46(a), and an "unconscionable action or course of action," which means "an act or

practice which, to a consumer's detriment, takes advantage of the lack of knowledge,

ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

396.   Defendant violated Tex. Bus. & Com. Code § 17.46(b)(9) by "advertising goods or services with intent not to sell them as advertised[.]"

397.   Defendant violated Bus. & Com. Code § 17.46(b)(24) by "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]"

398.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

399.   Defendant knew that the Uconnect 5 was prone to malfunction since, at least, the issuance of its first generation of Uconnect, but concealed that information.

400.   In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect discussed above.

401.   Defendant's acts and practices, described herein, are unfair in violation of Texas law because it violates Texas public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

402.   Defendant advertised, marketed, and sold the Class Vehicles as set forth herein. Thus, Defendant wrongfully:

a.   Knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed the true value of the Class Vehicles;

b.   engaged in unconscionable, false, misleading, and/or deceptive acts and/or practices in the conduct of trade or commerce – marketing, advertising, and selling the Class Vehicles.

c.   Advertised the Class Vehicles with intent not to sell them as advertised and

d.   Failed to make repairs or made repairs and provided replacements that caused Plaintiffs and the Texas Class members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless.

403.   Defendant had a duty to Plaintiff and Texas Class Members to disclose the Defect because it has the superior position to know about the safety defect in the Class Vehicles' Uconnect systems

404.   As a result of Defendant's conduct, Plaintiff Short and Texas Class Members were harmed and suffered damages in that the Class Vehicles experienced and may continue to experience the Defect.

405.   Plaintiff Short and Texas Class Members are entitled to equitable relief, damages, including the diminished value of their Class Vehicles, attorneys' fees and costs, and any other relief provided by law.

## COUNT XIV

**UNJUST ENRICHMENT**
**(On Behalf of All Plaintiffs and the Nationwide Class**
**or, Alternatively, Each of the State Classes)**

406.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

407.   This claim is brought by Plaintiffs on behalf of the nationwide class or, in the alternative, each of the state classes under the laws of their respective home states.

408.   This claim is pleaded in the alternative to the other claims set forth herein pursuant to Fed. R. Civ. P. 8(d)(2).

409.   As the intended and expected result of its conscious wrongdoing, FCA has profited and benefited from the purchase and lease of Vehicles equipped with defective Uconnect systems.

410.   FCA has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of FCA's misconduct alleged herein, Plaintiffs and the Class were not receiving Vehicles of the quality, nature, fitness, or value that had been represented by FCA, and that a reasonable consumer

111

would expect. Specifically, Plaintiffs and the Class members expected that when they purchased or leased Vehicles, they would not be equipped with a defective infotainment system.

411.  FCA has been unjustly enriched by its fraudulent, deceptive, unlawful, and unfair conduct, and withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

412.  Equity and good conscience militate against permitting FCA to retain these profits and benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, hereby respectfully request that this Court enter an Order against FCA providing the following:

A.   Certification of the proposed Class(es), appointment of Plaintiffs and their counsel to represent the proposed Class, and requiring notice to the proposed Class to be paid by FCA;

B.   Temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C.   Injunctive relief in the form of a recall or free replacement program, a warranty extension, or other injunctive relief as deemed necessary;

D.   Equitable relief in the form of buyback of the Vehicles;

E.      Costs, restitution, damages, including punitive damages, penalties, and

disgorgement in an amount to be determined at trial;

F.      Requiring FCA to pay both pre- and post-judgment interest on any

amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.


Dated: June 19, 2024                    Respectfully submitted,

                                        By:   *E. Powell Miller*
                                        _____
                                        E. Powell Miller (P39487)
                                        Dennis A. Lienhardt, Jr. (P81118)
                                        **THE MILLER LAW FIRM**
                                        950 W. University Drive, Suite 300
                                        Rochester, MI 48307
                                        T: (248) 841-2200
                                        epm@millerlawpc.com
                                        dal@millerlawpc.com

                                        Andrew W. Ferich
                                        Melissa R. Clark
                                        **AHDOOT & WOLFSON, PC**
                                        201 King of Prussia Road, Suite 650
                                        Radnor, Pennsylvania 19087
                                        T: (310) 474-9111
                                        aferich@ahdootwolfson.com
                                        mclark@ahdootwolfson.com

Benjamin F. Johns
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
T: (610) 477-8380
bjohns@shublawyers.com
sholbrook@shublawyers.com

Patricia I. Avery
Adam J. Blander
Sasha Marseille
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
T: (212) 759-4600
pavery@wolfpopper.com
ablander@wolfpopper.com
smarseille@wolfpopper.com

Lawrence Deutsch
Jeffrey Osterwise
**BERGER MONTAGUE**
1818 Market St.
Philadelphia, PA. 19103
(215) 875-3062
ldeutsch@bm.net
josterwise@bm.net

*Attorneys for Plaintiffs and the Proposed Class*